Argued and submitted January 7, reversed and remanded September 1, 2010,
petition for review allowed February 3, 2011 (349 Or 602)

FRIENDS OF YAMHILL COUNTY, INC.,
an Oregon non-profit corporation,
*Petitioner-Appellant,*

*v.*

BOARD OF COMMISSIONERS
OF YAMHILL COUNTY,
an Oregon municipal corporation;
and Gordon Cook,
individual resident of the State of Oregon
and Yamhill County,
*Respondents-Respondents.*

Yamhill County Circuit Court
CV080305; A140899

238 P3d 1016

Ralph O. Bloemers argued the cause and filed the opening brief for appellant. With him on the reply brief was Crag Law Center.

Charles F. Hudson argued the cause for respondent Gordon Cook. With him on the brief was Lane Powell, PC.

John M. Gray, Jr., waived appearance for respondent Board of Commissioners of Yamhill County.

Before Wollheim, Presiding Judge, and Sercombe, Judge, and Deits, Senior Judge.

SERCOMBE, J.

## SERCOMBE, J.

This case concerns whether the circuit court applied correct legal standards in its review of a county determination that claimant had vested rights to continue development of a subdivision. The county decision under review recognized claimant's prior efforts to obtain subdivision approval and construct related improvements as sufficient to vest claimant's right to construct nine additional houses on the property. That vesting determination qualified the property as subject to special zoning allowances under a law recently adopted by the voters. Petitioner Friends of Yamhill County (Friends) contends that the reviewing court erred in upholding the county's vested rights decision because there was insufficient evidence in the local government administrative record to establish vested rights under the applicable legal standards. We conclude that the reviewing court erred in applying the applicable law in its review of the county decision and that the court should have remanded, rather than sustained, the county approval. Accordingly, we reverse and remand this case for further proceedings.

The case arises in the context of an original law and its replacement, both adopted by the voters, that provide remedies to property owners whose property values are adversely affected by land use regulations. The original law, Measure 37, was adopted through the initiative process in the 2004 general election, Or Laws 2005, ch 1, and codified at ORS 197.352 (2005). The law was subsequently amended, Or Laws 2007, ch 424, § 4, and, in 2007, it was renumbered as ORS 195.305. Measure 37 required state and local governments to provide "just compensation" to a property owner when a governmental entity enacted or enforced a post-acquisition land use regulation that restricted the use of the property in ways that reduced its fair market value. *Former* ORS 197.352(1); *see generally MacPherson v. DAS*, 340 Or 117, 130 P3d 308 (2006) (explaining operation of Measure 37). Under the measure, that regulatory effect allowed an affected property owner to demand just compensation from the government. If a claimant qualified for relief, the governmental entity could respond in one of two ways: either by paying the claimant the amount of the reduction of the property's value, *former* ORS 197.352(2), or by deciding to

"modify, remove, or not to apply the land use regulation * * * to allow the owner to use the property for a use permitted at the time the owner acquired the property," *former* ORS 197.352(8). In the subsequent adjudication of Measure 37 claims, the option to exempt property from otherwise applicable regulations and allow a specified use became known as a "Measure 37 waiver."

Following the adoption of Measure 37, compensation claims were filed at the state and local government levels, seeking to avoid the restrictions on land use by the combined effect of state regulations and local zoning laws, such as restrictions on development on rural land zoned for agricultural and forestry uses. The potential disruptive effect of that development, together with a lack of clarity in Measure 37's provisions, led to calls for a revision of the measure. *See* Official Voters' Pamphlet, Special Election, Nov 6, 2007, 20 (Legislative Argument in Support of Measure 49).

The 2007 Legislative Assembly referred to the voters a substitute statute, Measure 49, that narrowed the effect of Measure 37, including a reduction in the degree of residential development allowed under a requested Measure 37 waiver. Or Laws 2007, ch 424; *see generally Corey v. DLCD*, 344 Or 457, 184 P3d 1109 (2008) (describing the purpose and effect of Measure 49). The measure was adopted by the voters in a special election held on November 6, 2007, and became effective on December 6, 2007. Or Const, Art IV, § 1(4)(d) (time of effect of initiated or referred measures).

Measure 49 redefines the adjudicatory processes, standards, and allowed relief for two classes of Measure 37 claims: those filed on or before June 28, 2007 (the concluding day of the 2007 legislative session) and those filed thereafter. As to the former class of claims, section 5 of the measure provides:

"A claimant that filed a claim under ORS 197.352 on or before the date of adjournment sine die of the 2007 regular session of the Seventy-fourth Legislative Assembly [June 28, 2007] is entitled to just compensation as provided in:

"(1)  Sections 6 or 7 of this 2007 Act, at the claimant's election, if the property described in the claim is located

entirely outside any urban growth boundary and entirely outside the boundaries of any city;[1]

"(2)   Section 9 of this 2007 Act if the property described in the claim is located, in whole or in part, within an urban growth boundary;[2] or

"(3)   A waiver issued before the effective date of this 2007 Act [December 6, 2007] to the extent that the claimant's use of the property complies with the waiver and the claimant has a common law vested right on the effective date of this 2007 Act to complete and continue the use described in the waiver."

The questions in this case largely concern the meaning and application of section 5(3) of Measure 49.[3] We state the facts from the uncontested findings of the county's vesting officer adopted after an administrative hearing. Claimant owns a 38.8-acre parcel in rural Yamhill County that is zoned AF-80 (Agriculture Forestry), zoning that restricts residential development of the land and that was apparently imposed after claimant acquired the property on December 3, 1970. The property is improved with a residence. Claimant sought and obtained Measure 37 waivers from the state and county to divide the property and construct additional homes on the lots created by the land division. Yamhill County Board Order 06-691, issued on September 27, 2006, authorized claimant

"to make application to divide the subject property into ten lots and, upon the Planning Director's issuance of land division approval, to make applications to establish dwellings on undeveloped lots under land use regulations then in effect on December 3, 1970."

Analogously, the state waiver, Final Order Claim No. M129384, issued November 17, 2006, provided:

---

[1] Section 6 requires approval of up to three lots, parcels, or dwellings under certain circumstances. Section 7 permits discretionary approval of up to 10 homesites under a more narrow set of circumstances.

[2] Section 9 provides that owners of property within the urban growth boundary of a city may qualify to develop one to 10 single-family dwellings under specified circumstances.

[3] The temporary parts of Measure 49 that pertain to previously filed Measure 37 claims (sections 5, 6, 7, 8, 9, 10, and 11) were not codified. See ORS 195.305 (explanatory note).

"1.  In lieu of compensation under ORS 197.352, the State of Oregon will not apply the following laws to Gordon Cook's division of the 38.8-acre subject property into nine 2.69-acre parcels and one 12.4-acre parcel or to his development of a dwelling on each 2.69-acre parcel: applicable provision of Goals 3 and 4, ORS 215 and OAR 660, divisions 6 and 33. These land use regulations will not apply to the claimant only to the extent necessary to allow him to use the subject property for the use described in this report, and only to the extent that use was permitted when he acquired the property on December 3, 1970.

"2.  The action by the State of Oregon provides the state's authorization to the claimant to use the property for the use described in this report, subject to the standards in effect on December 3, 1970."

Based on those waivers, the county granted approval of a preliminary subdivision plat for division of the property into nine 2.69-acre lots and one 12.4-acre lot on May 11, 2007. Claimant incurred legal, surveying, and engineering expenses to obtain the waivers and preliminary subdivision approval. He then provided labor and expended money to grade the property, construct some of the roads in the proposed subdivision, arrange for the construction of electrical service distribution lines to serve the property, and widen the adjacent county road. The vesting officer found that claimant spent money, incurred obligations, and contributed labor by December 6, 2007, that had a value exceeding $155,000. Claimant entered into an agreement with the county for future road development. Those efforts satisfied the conditions of preliminary subdivision approval, and the final plat was approved and then recorded on December 5, 2007.

After Measure 49 went into effect, claimant opted to seek county certification of his vested rights to develop the property under section 5(3) of Measure 49, rather than apply for the residences allowed under section 5(1). The county had adopted an ordinance establishing a process for review and determination of vested rights claims under Measure 49 by an appointed vesting officer. Measure 49 Vested Rights Ordinance. Claimant applied for relief under that ordinance. Claimant sought to vest the same number of dwellings that

had been allowed under the waiver. The vesting officer determined that the homesite use was a lawful use under section 5(3) of Measure 49 because the claimant had a common-law vested right as of December 6, 2007, to complete and continue the use of his property as a subdivision of developable lots.[4]

Friends, which had participated in the vesting adjudication by the county vesting officer, sought review under section 16 of Measure 49, now codified at ORS 195.318. ORS 195.318(1) provides, in part, that a

> "person that is adversely affected by a final determination of a public entity under ORS 195.310 to 195.314[, statutes providing for prospective compensation claims,] or sections 5 to 11, chapter 424, Oregon Laws 2007, * * * may obtain judicial review of that determination under ORS 34.010 to 34.100, if the determination is made by * * * a county."

ORS 195.318(3) further provides:

---

[4] The vesting officer concluded that claimant's rights to complete development of the subdivision were established by the December 5, 2007, final plat approval and that those rights were not affected by the subsequent effectiveness of Measure 49 on December 6, 2007. He considered the relevant land use to be the "creation of individual, saleable and developable homesites." According to the vesting officer, that use was completed by the recording of the final subdivision plat; the subsequent application of Measure 49 made that use a nonconforming use and obviated the need to determine whether an inchoate vested right to develop the property existed. He concluded that Measure 49 "should not be applied retroactively to divest the applicant in this case of entitlements that he legally obtained from the County prior to the effective date of [Measure 49]."

On review, the reviewing court annulled that part of the county decision. Claimant does not seek review over the court's rejection of the vesting officer's determination that a use allowed by a Measure 37 waiver could become nonconforming before the effective date of Measure 49 and not need to be justified under section 5 of Measure 49. We express no opinion on the correctness of the court's ruling. We do note, however, that the Supreme Court held in *Corey* that "[a]n examination of the text and context of Measure 49 conveys a clear intent to extinguish and replace the benefits and procedures that Measure 37 granted to landowners." 344 Or at 465. The court further noted that "Measure 49 by its terms deprives Measure 37 waivers—and *all* orders disposing of Measure 37 claims—of any continuing viability, with a single exception that does not apply to plaintiffs' claim[, *i.e.*, a vested rights determination under section 5(3)]. Thus, after December 6, 2007 (the effective date of Measure 49), the final order at issue in the present case had no legal effect." *Id.* at 466-67 (emphasis in original). *See also Pete's Mountain Homeowners Assn. v. Clackamas Cty.*, 227 Or App 140, 151, 204 P3d 802, *rev den*, 346 Or 589 (2009) (Measure 49 as abrogating the continued application of the "goalpost" statute, ORS 215.427(3)(a), to development allowed by Measure 37 waiver); *Cyrus v. Board of County Commissioners*, 226 Or App 1, 202 P3d 274 (2009) (appeal on the validity of a Measure 37 waiver dismissed as moot in light of the enactment of Measure 49 notwithstanding partial construction of the waived use).

"Notwithstanding subsection (1) of this section, judicial review of a final determination under ORS 195.305 or 195.310 to 195.314 or sections 5 to 11, chapter 424, Oregon Laws 2007, * * * is:

"(a)  Limited to the evidence in the record of the public entity at the time of its final determination.

"(b)  Available only for issues that are raised before the public entity with sufficient specificity to afford the public entity an opportunity to respond."

ORS 34.010 to 34.100 describes the writ of review process; ORS 34.020 provides, in part, that "any party to any process or proceeding before or by any inferior court, officer, or tribunal may have the decision or determination thereof reviewed for errors." As relevant here, ORS 34.040(1) allows issuance of the writ when

"an officer or tribunal * * * in the exercise of judicial or quasi-judicial functions appears to have:

"* * * * *

"(c)  Made a finding or order not supported by substantial evidence in the whole record; [or]

"(d)  Improperly construed the applicable law[.]"

A reviewing court has authority to "affirm, modify, reverse or annul the decision or determination reviewed, and if necessary, * * * to direct the inferior court, officer, or tribunal to proceed in the matter reviewed according to its decision." ORS 34.100.

As relevant here, Friends' petition for a writ of review pleaded that the county (1) erred in determining that claimant had vested rights without considering whether his use of the property complied with the issued waivers; (2) misconstrued applicable law and made a decision not supported by substantial evidence in determining vested rights without evidence of the likely costs of the residential development and the adaptability of claimant's expenditures to achieve alternative lawful uses; and (3) misconstrued applicable law by failing to discount the costs of preparing the property for development in its assessment of vested rights. Friends sought reversal or annulment of the vesting officer's decision.

After briefing and argument, the reviewing court affirmed the vesting officer's findings and conclusions that claimant had a vested right to complete development of the subdivision with residences. The court issued a letter opinion addressing the review of claimant's vested right determination together with review proceedings of other claimants with similar factual and procedural claims. The court first noted the limited nature of the writ of review proceeding:

> "It is also important at this point to note what else is or is not in issue. This is not a question of whether this court agrees or disagrees with the decision of the vesting officer. This is not an appeal, nor is it *de novo* review where the court has latitude to substitute its own assessment of the facts. It is a judicial review of the vesting officer's decisions for correct application of the law, jurisdiction and sufficiency of the evidence in support of factual findings or conclusions."

(Footnote omitted.)

The court then analyzed the sufficiency of the county record in each case to support the vesting officer's findings on the application of vested rights standards under section 5(3), concluding that "there is substantial evidence in the record to support the conclusion that the factors taken collectively establish a vested common law right to complete the residential use of the property as described in the waivers."

On appeal, Friends contends that the court erred in its review of the vesting officer's legal conclusion that the determined facts established a "common law vested right * * * to complete and continue the use described in the waiver" under section 5(3) of Measure 49. More particularly, Friends asserts that the court should have reversed the vesting officer's determination because claimant presented insufficient evidence to establish a vested right. Friends argues that vested rights to develop residential uses cannot be established as a matter of law without the start of home construction or, alternatively, without evidence of substantial expenditures toward the end of residential development where the substantiality of the expenditures is measured against the total costs of the development. It further contends that the court erred in concluding that the county's determination

that claimant acted in good faith was supported by substantial evidence. Friends reasons that claimant's expenditure of money on the subdivision after the date Measure 49 was referred to the voters establishes bad faith as a matter of law and that the failure to consider that bad faith affected the legal determination of vested rights. Friends finally asserts that the court erred in rejecting its contention that the vested rights found by the vesting officer exceeded those permitted under the waivers.

Claimant responds that the start of home construction is not necessary to establish vested rights; the reviewing court properly determined that there was substantial evidence to support the factual conclusion that rights vested; and the vested rights determination was legally sufficient without evidence of the total project costs. Claimant further contends that the lawfulness of the subdivision—whether it complied with the issued waivers—was established by the approval of the final plat by the county.

Under ORS 34.100, "an appeal" may be taken from a judgment of the circuit court on review "in like manner and with like effect as from a judgment of a circuit court in an action." As we discussed in *Johnson v. Civil Service Board,* 161 Or App 489, 498, 985 P2d 854, *modified on recons*, 162 Or App 527, 986 P2d 666 (1999), our standard of review in appeals brought pursuant to ORS 34.100 ultimately depends on the "triggers" described in ORS 34.040(1)(a) to (e) for the issuance of the writ. In *Johnson*, we explained:

> "Those 'triggers' ultimately rest on legal determinations— *e.g.*, whether there is jurisdiction, whether the decision was unconstitutional, etc. Even the determination of whether a finding or order was supported by substantial evidence is circumscribed by legal principles. *See, e.g., Reguero* [*v. Teacher Standards and Practices*], 312 Or [402,] 417[, 822 P2d 1171 (1991)] (describing standard for determining propriety of relying on hearsay as substantial evidence)."

161 Or App at 498. In *Johnson*, given the centrality of *Reguero* to that petitioner's substantial evidence challenge, we reviewed the circuit court's denial of the writ for errors of law. *Id.* Similarly, here, we review the trial court's partial affirmance of the county's determination for errors of law;

that is, we ask whether the trial court correctly applied ORS 34.040(1)(c) and (d). *See Salosha, Inc. v. Lane County*, 201 Or App 138, 142, 117 P3d 1047 (2005) (citing *Johnson*, 161 Or App at 498, and discussing the standard of review applicable to writs sought under ORS 34.040(1)(c) (lack of substantial evidence)). In particular, given Friends' contentions, our task is to ascertain whether the court erred in its construction of the term "use of the property" in section 5(3) of Measure 49 in applying the proper standard of review to the county's justification that the use complied with the waivers, and in the court's assessment of whether the "county's failure to consider or give proper weight to [a specific vested rights determination] factor might have affected the vested rights determination." *See Union Oil Co. v. Board of Co. Comm. of Clack. Co.*, 81 Or App 1, 8, 724 P2d 341 (1986) (stating that standard for reviewing LUBA opinion that, in turn, reviewed local government application of vested rights standards); *see also Cook v. Clackamas County*, 50 Or App 75, 622 P2d 1107, *rev den*, 290 Or 853 (1981) (review obtained of the weight given to and manner of application of vested rights factors in an appeal of a judgment rendered in an action at law).

■        The categorization and resolution of Friends' specific contentions about the meaning and application of section 5(3) of Measure 49 requires an understanding of the factors used by Oregon courts and agencies to evaluate the creation of a "common law vested right," as that term is used in Measure 49. We assume that the legislature and voters "intended to incorporate the legal meaning of [a statutory] term that this court has developed in its cases." *Joshi v. Providence Health System*, 342 Or 152, 158, 149 P3d 1164 (2006).

In *Corey*, the Supreme Court evaluated the meaning of "common law vested right," as used in Measure 49, noting that

"[i]t is clear from text and context alone that that phrase is referring to broadly applicable legal precedents describing a property owner's rights when land use laws are enacted that make a partially finished project unlawful. *See, e.g., Clackamas Co. v. Holmes*, 265 Or 193, 197, 508 P2d 190 (1973) (describing 'vested rights' in those terms)."

344 Or at 466. Thus, a "common law vested right" is one established by the application of court-made equitable principles rather than standards adopted by a legislative body. The "policy underlying the notion of vested rights is basically one of fairness[.]" And, it "focuses on financial and economic commitment to a particular use." *Polk County v. Martin*, 50 Or App 361, 366-67, 622 P2d 1152, *rev'd on other grounds*, 292 Or 69, 636 P2d 952 (1981).

The common law of the states differs on the type and degree of efforts necessary to establish a vested right to complete development. "[T]he general majority rule is that a vested right exists when a building permit has been issued by the municipality, substantial construction or expenditures in reliance on the building permit are in evidence, and the landowner acted in good faith." Patricia E. Salkin, 4 *American Law of Zoning* § 32:2, 32-3 (5th ed 2010). "Some states allow rights to vest early in the development process, requiring only the filing of an application with the municipality." *Id.* § 32:3, 32-12. Finally, a group of states use a "balancing interest test, or some variation thereof, [in which] vested rights depend on 'equitable fairness, both to the property owner and to the general public.' " *Id.* § 32:3, 32-14. Oregon jurisprudence is in the last camp.

The Supreme Court articulated and applied guidelines in *Holmes* to determine whether rights vest to complete and continue an improved property use. In that case, property owners purchased unzoned rural property, planning to construct a chicken processing facility. 265 Or at 196. Toward that particular end, the owners conducted soil tests, received state preliminary approval for wastewater disposal, constructed a well sized for industrial use, purchased an irrigation system, planted a type of grass suitable for wastewater disposal, and installed an electrical power distribution system, all at a cost of $33,000. The total cost of the project would be between $400,000 and $500,000. The county then adopted zoning that precluded the chicken processing plant use. When the owners began construction of the processing plant, the county sought and obtained injunctive relief to enjoin further construction. *Id.*

The Supreme Court reversed, concluding that the owners had a vested right to complete and use the processing plant. *Id.* at 201. Relying on general treatises, the court first observed:

> "The courts and the text writers are agreed that in order for a landowner to have acquired a vested right to proceed with the construction, the commencement of the construction must have been substantial, or substantial costs toward completion of the job must have been incurred."

*Id.* at 197 (citations omitted). After noting that "[s]ome courts have attempted to define substantial expenditures on the basis of the ratio of expenses incurred to the total cost of the project[,]" *id.*, the court held:

> "The test of whether a landowner has developed his land to the extent that he has acquired a vested right to continue the development should not be based solely on the ratio of expenditures incurred to the total cost of the project. We believe the ratio test should be only one of the factors to be considered. Other factors which should be taken into consideration are the good faith of the landowner, whether or not he had notice of any proposed zoning or amendatory zoning before starting his improvements, the type of expenditures, i.e., whether the expenditures have any relation to the completed project or could apply to various other uses of the land, the kind of project, the location and ultimate cost. Also, the acts of the landowner should rise beyond mere contemplated use or preparation, such as leveling of land, boring test holes, or preliminary negotiations with contractors or architects."

*Id.* at 198-99 (citations omitted).

In applying those factors, the court found it significant that the county advised the owners before purchase of the property for the chicken processing plant use "that the land was unzoned and there was 'no long range planning in that area.' " *Id.* at 199. Based on that advice and preliminary state approval of the planned wastewater disposal system, the owners purchased the property and constructed project-specific improvements. That context and the ratio of incurred expenditures allowed the court to determine that "the amount of $33,000 spent by defendants was substantial[,]" *id.* at 200, and, ultimately, to conclude that "the defendants

acted in good faith, the expenses incurred were substantial and directly related to the construction and operation of the processing plant, and therefore defendants acquired a vested right to complete the construction." *Id.* at 201.

The court expressly noted that the defendants' failure to obtain a building permit before the zone change did not preclude a vesting:

> "The plaintiff argues that defendants' claim to a vested right to complete the plant must fail because they did not secure a building permit. The defendants had not started construction of any buildings prior to the enactment of the ordinance—all of the $33,000 expenditures were related to the land, as we have mentioned. After enactment of the zoning ordinance, it is obvious that the county would not have granted defendants a permit to construct a chicken processing facility."

*Id.* at 200-01. Thus, the good faith of the landowners in *Holmes* and other equitable factors—the purchase of the property for the vested use in reliance on zoning representations by the county and prior approval of the wastewater system by state authorities—affected the degree of expenditures found to be substantial enough to create a vesting.

The interrelatedness of the *Holmes* factors was confirmed in *Eklund v. Clackamas County*, 36 Or App 73, 583 P2d 567 (1978), *overruled on other grounds by Forman v. Clatsop County*, 63 Or App 617, 665 P2d 365 (1983). There, we concluded that a determination of vested rights under the *Holmes* guidelines requires consideration of the factors as a whole: "None of these factors is predominant; they are merely guidelines in assessing the evidence and deciding the issue." *Eklund*, 36 Or App at 81. A vested right to complete a partially constructed subdivision was found based on the prior construction and residential development of its initial phases, preliminary approval of the subdivision by zoning authorities, completed construction and use of a water system to serve the entire subdivision, approval of the water system by state health authorities, and the inability to spread the operational costs of that water system among occupants of only part of the subdivision. *Id.* at 82.

In *Eklund,* the good faith of the landowner, prior construction of part of the development, the inadaptability of the investment for zoned agricultural uses, the completeness of the utility system, and other equitable factors—prior governmental approvals and the inequity to existing users of the water system—obviated the need to assess the proportionality of expenditures to the total project costs in order to find a vesting. We noted that "[t]here is no evidence in the record respecting the projected ultimate cost, but the monies expended thus far are substantial." *Id.* at 81.

By contrast, the proportionality of expenditure factor was more probative in *Webber v. Clackamas County,* 42 Or App 151, 600 P2d 448 (1979), also involving the vesting effect of a constructed water supply system. In *Webber,* the plaintiffs had invested money towards developing a 127-acre parcel for residential use by constructing a water system designed to serve approximately 250 houses. *Id.* at 153. The plaintiffs argued that construction of the water system vested the right to sell the homesites and that the proportionality of expenditure factor should be measured against lot development costs rather than the entire cost of residential development. We found that approach to be "untenable" and that there was no evidence of total project costs "upon which we can make the appropriate economic findings." *Id.* at 155 n 2. We concluded that rights to a 250-residence development did not vest because of a presumably low expenditure ratio and because the investment could be adapted to serve a lower density residential development on the plaintiffs' land as well as nearby residential property.[5] *Id.* at 155-57. We distinguished *Eklund:*

> "In *Eklund* * * *, we found that a nonconforming use had been established on the basis of construction of a water system plus other factors which are not present here. Plaintiffs correctly acknowledge in their brief that the proponent of the vested right in *Eklund* had proceeded further with development than plaintiffs did in this case. There, the water system in question was an integral part of a larger system designed to serve a residential development of

---

[5] In *Webber,* the court noted that the adaptability factor required a showing of an "irreversible commitment" to the desired vested use. 42 Or App at 156. That *dictum* was disavowed in *Cook,* 50 Or App at 84, 84 n 5.

which a major portion had already been completed, and the system was not compatible with other uses."

*Webber*, 42 Or App at 156 n 3.

In *Union Oil Co.*, the petitioner sought to establish an automobile service station as a vested use. 81 Or App at 3. That application was denied by the county, and the denial was upheld on review by the Land Use Board of Appeals. *Id.* On further review in this court, the petitioner argued that the county erred in failing to include the petitioner's purchase price for the property in evaluating the *Holmes* expenditure ratio factor, arguing that, "for purposes of the substantiality test, only the gross *amount* of expenditures is relevant, and the *purpose* of the expenditures can be considered only in connection with the type of expenditure test." *Id.* at 5 (emphases in original). We rejected that contention, explaining, "The problem with petitioner's argument is that it takes each of the tests or factors enumerated in *Holmes* as being wholly independent of the others." *Id.* at 6. Although we recognized that the purchase of property for an intended use, later made unlawful, was relevant to the "good faith" element in the *Holmes* equation, *id.* at 7, we concluded that the "cost of acquiring the land is not a determinant of whether the owner has made substantial expenditures toward the commencement of the planned activity on the land." *Id.* at 8.

The petitioner then contended that the county's decision should be remanded because it failed to consider all of the *Holmes* factors in reaching its determination that no vested rights had accrued. *Id.* The county argued that local governments had "the prerogative of giving greater weight to some factors than to others, as the circumstances of specific cases may indicate or dictate." We concluded:

"Whatever abstract merit there may be to petitioner's argument, petitioner does not reduce it to particulars. It may be that a county's failure to consider or give weight to a specific factor in a specific case could be a basis for remand but only if the proponent or opponent of the vested right at least demonstrates that the county's failure to consider or give proper weight to the factor might have affected the vested rights determination. Petitioner makes no such demonstration."

*Id.*

The above cases establish that all of the *Holmes* factors are material to the determination of a vested right and that they are interrelated. The inquiry is equitable in nature, requiring an evaluation of the progress of land development at the time of the downzoning, either in terms of a substantial start of construction of the vested use itself or substantial expenditures toward that particular end (as distinguished from expenditures for an otherwise lawful use of the property). The adaptability of expenditure factor is more significant, as was the case in *Webber*, when the change of law does not entirely preclude the intended use. The degree of construction or expenditures necessary to be substantial depends on the proportion of those efforts or costs to the total project buildout or budget. Given the interrelatedness of the factors, the degree of construction or expenditure necessary to be substantial may be affected by the other *Holmes* factors (good or bad faith of landowner, size of project, the location of project with respect to other uses) and other equities, including the past conduct of the zoning authorities. Similarly, the degree to which a particular factor is material to a determination of vested rights is affected by the strength or weakness of the equities that result from the application of the remaining factors.

With that background, we turn to Friends' specific contentions. To reiterate, section 5(3) of Measure 49 provides that a timely Measure 37 claimant is "entitled to just compensation" through the residential development provided in the measure or by virtue of

"[a] waiver issued before [December 6, 2007,] to the extent that the claimant's use of the property complies with the waiver and the claimant has a common law vested right on [December 6, 2007,] to complete and continue the use described in the waiver."

Friends first contends that the reviewing court erred in its construction of the term "use of the property" in section 5(3). The vesting officer found:

"The 'use' in this case is subdivision of the property and establishment of 10 homesites. Approval of the preliminary plat on May 11, 2007, and recording of the final plat on

December 5, 2007 are substantial evidence that the applicant's use of the property complies with waivers from the State and County * * *. In the alternative, as a matter of law the decision by the County to approve the preliminary and final plats in this case established that the uses approved therein complied with the waivers, a decision that cannot be attacked collaterally in these proceedings."

The reviewing court determined that the vesting officer misconstrued the meaning of "use" in section 5(3):

"I conclude that the vesting officer misconstrued the law when he equated 'use' with 'subdivision of the property and establishment of homesites.' The plain meaning of 'use' means a 'residential use' or 'commercial use' and requires actual employment of land for that purpose. That is not to say it requires *completion* of construction of a dwelling or commercial building. That is at the core of the vested rights concept—that a landowner has the right to *complete* construction necessary for that use, if the landowner has met the common law vesting requirements to do so. The text and context of the word 'use' does not support the vesting officer's interpretation."

(Emphases in original.) The court concluded that the relevant "use of the property" was the "actual employment of land" for residential development and that the phrase did not require a completed use—the construction and occupation of homes—but could be shown by actions on the property toward the construction of residences, including the construction of roads and utility systems. Friends asserts that the court erred in its construction of the term and that "use of the property" requires substantial actions to actually initiate the construction of dwellings after the issuance of residential building permits. As noted earlier, we review the court's construction of the term "use of the property" for legal correctness.

Our task is to determine the voters' intent in enacting section 5(3) of Measure 49, which we glean from the text, context, and legislative history of the statute, resorting if necessary to maxims of statutory construction. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).[6] The plain text of

[6] The legislative history of Measure 49 is not helpful to the analysis of the statutory construction issues in this case. The measure was enacted as House Bill (HB)

that section provides that a claimant is "entitled to just compensation as provided in * * * [a] waiver issued" before December 6, 2007. However, the "extent" of that entitlement is limited in two separate ways: (1) by requiring that the claimant use the property consistently with the waiver and not for some other kind or degree of use; and (2) by whether, and the extent to which, the use described in the waiver has vested under the common law. Put another way, the use must not only "vest" under the common law; the text imposes a separate requirement that the property be used as described in the waiver.

■    The plain meaning of "use" in this regard is the employment of land for a particular purpose. Among its numerous definitions, "use" is generally defined to mean "to put into action or service : have recourse to or enjoyment of : EMPLOY." *Webster's Third New Int'l Dictionary* 2523 (unabridged ed 2002). Analogously, "farm use" is defined by ORS 215.203(2)(a), for purposes of statutes regulating zoning of agricultural lands, as "the current employment of land for the primary purpose of obtaining a profit in money by [various agricultural activities]." Zoning laws typically define allowed land "uses" by referencing particular activities on land or structural improvements to land. *See, e.g.*, ORS 215.213 and ORS 215.283 (listing of "uses" allowed in exclusive farm use zones as including certain types of structures (*e.g.*, "public or private schools," "churches," and "dwellings") and "operations" or activities on land (*e.g.*, "operations for the exploration for minerals" and "creation, restoration or enhancement of wetlands")); ORS 215.441 and ORS 227.500 (regulating "use of * * * real property for activities customarily associated with" places of worship). Thus, the plain meaning of the text confirms, as the reviewing court concluded, that "use of the property" means the actual employment of land for a residential purpose.

---

3540 (2007) and referred to the voters on June 15, 2007. Or Laws 2007, ch 424. The provision concerning vested rights is not referenced in the ballot title for Measure 49. The explanatory statement for the measure provided by the 2007 Legislative Assembly notes that "[c]laimants who have received land use waivers under Measure 37 are entitled to complete developments under the provisions of Measure 37 if they have established vested rights to do so." Voters' Pamphlet at 19.

Nonetheless, Friends contends that the "use of the property" for purposes of waiver consistency under section 5(3) must be a use authorized by a building permit. But the text of section 5(3) requires only that the property owner's use "complies with the waiver." To whatever extent an issued waiver allows activities on the land without a predicate building permit, those activities are a "use of the property [that] complies with the waiver." In this case, there are two waivers—one from the state and one from the county. The county's waiver allowed activities on the property to "divide the subject property into ten lots" and to "establish dwellings on undeveloped lots." The state waiver also did not apply regulations that would inhibit "division of the 38.8-acre subject property into nine 2.69-acre parcels and one 12.4-acre parcel or to [claimant's] development of a dwelling on each 2.69-acre parcel." A single-family residence on nine lots no smaller than 2.69 acres is the use allowed by the waivers. Claimant's construction of infrastructure that is consistent with the amount and degree of the development allowed by the waiver and sought through the vesting decision is a "use of the property [that] complies with the waiver."

■　　Friends next argues that, even if residentially improved 2.69-acre lots are generally allowed by the waivers, the state waiver restricts the allowed use "to the extent that use was permitted when [claimant] acquired the property on December 3, 1970." Friends contends that the administrative record establishes that, at the time of acquisition, county zoning law precluded single-family dwellings on claimant's property, unless the dwellings were in conjunction with farm use. Therefore, according to Friends, claimant's use of the property for more intensive residential development is not a "use of the property [that] complies with the waiver." Claimant responds that approval of the subdivision plat necessarily adjudicated the lawfulness of the proposed residential development and that Friends' assertion is an impermissible collateral attack on the plat approval. Claimant also contends that the residential uses allowed under the waiver were consistent with the acquisition zoning and that the same legal issue about the effect of that zoning was decided against Friends' contentions in *Reeves v. Yamhill County*, 55 Or LUBA 452 (2007).

We agree with claimant that plat approval by the county is a determination of its compliance with applicable zoning regulations but do not agree that it precludes Friends' argument. ORS 92.090(3)(c) precludes approval of a subdivision plat by a city or county unless the "subdivision * * * plat complies with any applicable zoning ordinances and regulations * * * that are then in effect for the city or county within which the land described in the subdivision * * * plat is situated." ORS 92.090(2)(c) requires the same determination for county approval of a tentative plan for a subdivision.

The approval of a tentative subdivision plan is a "limited land use decision." ORS 197.015(12). ORS 197.195 requires notice and opportunity to comment prior to any approval of a limited land use decision. Yamhill County Land Division Ordinance (YCLDO) sections 4.045 to 4.060 implement the requirements of ORS 197.195. Under those procedures, notice of a tentative subdivision plan application and opportunity to comment is given to owners of land adjoining the proposed subdivision and members of the planning commission and board of county commissioners. Application notice is also published in a newspaper of general circulation in the county. YCLDO § 4.050; Yamhill County Zoning Ordinance (YCZO) § 1301.01 (Type B procedure). Once the planning director approves the tentative subdivision plan, the director provides notice of decision to "the [board of county commissioners], the owner, referral agencies, those submitting statements in support or opposition, those present at the review session and those requesting information in writing of such decisions." YCLDO § 4.060. Any person notified of the decision may seek and obtain an evidentiary hearing on the application from a hearings officer. YCZO § 1301.01. Thus, there was a participatory process that allowed a quasi-judicial public hearing before the approval of the tentative subdivision plan. The record does not show if Friends was notified of the tentative subdivision plan application or director decision.

In order for the approval of the subdivision plat to be given preclusive effect in the instant case, however, the record must demonstrate that the following requirements were met:

"1.  The issue in the two proceedings is identical.

"2.  The issue was actually litigated and was essential to a final decision on the merits in the prior proceeding.

"3.  The party sought to be precluded has had a full and fair opportunity to be heard on that issue.

"4.  The party sought to be precluded was a party or was in privity with a party to the prior proceeding.

"5.  The prior proceeding was the type of proceeding to which this court will give preclusive effect."

*Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 104, 862 P2d 1293 (1993) (citations and footnote omitted). As was noted in *Nelson*, under the fifth requirement, not all types of administrative proceedings are appropriate to establish issue preclusion. *Id.* at 104-05 n 4.

"Whether an administrative decision has a preclusive effect depends on: (1) whether the administrative forum maintains procedures that are 'sufficiently formal and comprehensive'; (2) whether the proceedings are 'trustworthy'; (3) whether the application of issue preclusion would 'facilitate prompt, orderly and fair problem resolution'; and (4) whether the 'same quality of proceedings and the opportunity to litigate is present in both proceedings.' "

*Id.* (citations omitted).

Here, we need not decide whether, under the fifth requirement, the administrative proceeding that resulted in approval of the subdivision plat is the type of proceeding that will be given preclusive effect because the record fails to demonstrate that the second, third, and fourth requirements were met. Namely, the record does not show that Friends was notified of the tentative subdivision plan application or director decision, that Friends was a party to the proceeding, and that the issue Friends now raises—that claimant's use of the property, as indicated in the plat, is more intensive than that permitted when claimant acquired the property—was *actually* litigated in that proceeding. Therefore, the subdivision approval did not operate to preclude Friends from later contesting the lawfulness of any proposed development.

■     The reviewing court treated the zoning compliance issue as an issue of fact, to be decided by whether there was substantial evidence in the record that residential uses countenanced by the subdivision approvals were consistent with the acquisition zoning and therefore allowed by the waivers. But a different issue—the legal effect of the agricultural zoning at the time of property acquisition—was preserved and presented to the county by Friends. The county decision was governed by the Measure 49 Vested Rights Ordinance, an ordinance adopted under the county's planning authority set out at ORS 215.050.[7] That ordinance required the county review authority to

> "base its Final County Vesting Decision on whether the Applicant's use of the property complies with orders from the State and Board granting Measure 37 relief, and whether the Applicant has a common law vested right as of December 6, 2007 to complete and continue the use described in the waiver."

Measure 49 Vested Rights Ordinance § 2.04.

    Under its vested rights ordinance, the county was obliged to justify its vested rights determination in a decision that explained how the property use complied with the issued waivers. *See* Measure 49 Vested Rights Ordinance § 2.01 (obligation to "determine vested rights"); § 2.02 (delegation of authority to vesting officer to "make a Final County Vesting Decision"); § 2.04 (stating standards for issuance of vesting decision). The county decision did not make findings on the acquisition zoning and the limitations of that zoning. Accordingly, the decision was insufficient to explain why the proposed vested uses complied with the waivers. The reviewing court erred, therefore, in concluding that this part of the vesting decision was supported by substantial evidence under ORS 34.040(1)(c) when the decision failed to construe and apply the applicable zoning law that was relevant to the issue raised by Friends.

    Our determination on the waiver compliance necessitates a remand, and, arguably, obviates the need to address

---

[7] ORS 215.050(1) confers authority to the county governing body to adopt and revise "a comprehensive plan and zoning, subdivision and other ordinances applicable to all of the land in the county."

Friends' remaining arguments concerning whether the trial court misconstrued section 5(3) of Measure 49 by failing to properly and completely apply the *Holmes* factors for determining if claimant had a "common law vested right * * * to complete and continue [the subdivision development]." Nonetheless, for prudential reasons—namely, there is some likelihood that the question whether a vested right has been established will continue to be an issue on remand in this case and to obviate further, unnecessary appeals on that question—we will address Friends' arguments on this issue. *See Dept. of Transportation v. Stallcup*, 195 Or App 239, 254-55, 97 P3d 1229 (2004), *rev'd on other grounds*, 341 Or 93, 138 P3d 9 (2006).

■ In particular, Friends asserts that the court erred in (1) affirming the vesting officer's conclusion that a vested rights determination could be made for the claim without evidence of the costs of the buildout of the project and a comparison of that cost with the relevant expenditures made by claimant; and (2) including project expenditures made after June 15, 2007, the date of the Measure 49 referral, in determining whether those expenditures were "substantial" under *Holmes*. Claimant responds that the administrative record contained evidence of the total cost for the project sufficient to consider the expenditure ratio factor and that, in any event, the court did not err in not giving that factor determinative effect in the application of the *Holmes* factors. Claimant argues that the court did not err in affirming the county's legal conclusion that expenditures after June 15, 2007, were relevant to the expenditure ratio analysis and not otherwise probative of claimant's bad faith. We conclude that the court erred in affirming the county's decision that claimant's rights had vested because the county's decision lacked necessary findings and consideration of the expenditure ratio factor. We agree with claimant, however, that post-referral expenditures are relevant to consideration of the expenditure ratio factor and are not evidence of bad faith under *Holmes*.

Here, the vesting officer concluded that claimant's expenditures were "substantial" without making findings describing the particular type of residential development sought to be vested and the likely total cost of that development as of the vesting date. He concluded:

"Opponents have suggested that certain expenses and obligations incurred should not be counted, and that the amount spent should be weighed against an estimated total cost of constructing nine additional houses.

"This is a speculative analysis that may be necessary in other cases in which this factor deserves to be given more weight, but is not necessary to properly address [the expenditure ratio factor] in this case. All of the expenses in this case were legitimately incurred, in good faith, and are substantial. The fact that the applicants development was fully sanctioned by, and coordinated with, Yamhill County, is more important in this case than the speculative ratio test.

"The vesting officer also finds that the record in this case contains substantial evidence to support ratios that have been deemed acceptable in Holmes and other Appellate Court cases, under any of the tests proposed by the parties. The amount spent by the applicant and steps taken by the applicant to provide necessary infrastructure and utilities are 'substantial,' even if it is assumed that each house would cost $450,000 to construct."

(Underscoring in original.) Later in the decision, the vesting officer concluded that "this decision treats the 'ultimate cost' as the cost of establishing vacant homesites."

The reviewing court concluded that the vesting officer did not err in failing to determine the likely project costs—that is, the denominator of the expenditure ratio factor—in his application of the *Holmes* factors:

"I conclude that a specific determination of the denominator in each of these cases is not necessarily required. Further, even [if] it is, consideration of the other factors may be so favorable to the landowner that the absence of a denominator is simply not fatal to the ultimate conclusion which requires consideration of *all* factors.

"* * * And, in this court's view, it may be possible to determine that the expenditures and progress is 'substantial' without a clearly defined estimate of total cost. Appellate cases appear to have applied, or at least allowed, this approach in the past. If the landowners have spent what a reasonable person could conclude is a substantial amount of money that would seem to be a substantial investment so long as the fact-finder can at least

reasonably infer that it is a substantial expenditure in relationship to the reasonably foreseeable cost of completion."

(Footnote omitted; emphasis in original.) The court noted that it was "unable to locate figures for total construction, including houses. The vesting officer states that in most cases this is speculative in any event. Perhaps I have simply not found more specific figures. As stated, this may not be fatal."

As noted earlier, section 5(3) of Measure 49 contains three separate requirements: (1) that the "claimant's use of the property complies with the waiver" issued before December 6, 2007; (2) that the claimant has "a common law vested right * * * to complete and continue the use described in the waiver"; and (3) that the existence of the vested right be determined as of "the effective date of this 2007 Act [December 6, 2007]." Again, to recap, the existence of a "common law vested right" is determined by the factors set out in *Holmes*. As we noted in *Eklund*, the *Holmes* factors fall into four categories:

> "The Supreme Court in *Holmes* identified four essential factors to be considered in assessing the evidence of a nonconforming use[:] (1) the ratio of prior expenditures to the total cost of the project, (2) the good faith of the landowner in making the prior expenditures, (3) whether the expenditures have any relationship to the completed project or could apply to various other uses of the land, and (4) the nature of the project, its location and ultimate cost."

*Eklund*, 36 Or App at 81.[8]

In evaluating those criteria under section 5(3), the court erred in its legal determination that an assessment of the ratio of project-related expenditures to the overall expected costs of the residential development proposed to be vested was not necessary in order to determine that claimant had accrued a "common law vested right" as that term is used

---

[8] That conflation of the *Holmes* guidelines reads the good faith factor as including "whether or not [the landowner] had notice of any proposed zoning or amendatory zoning before starting * * * improvements." 265 Or at 198. And it assigns to the "adaptability" factor (the relationship of expenditures to other lawful uses) consideration of whether the expenditures are "mere contemplated use or preparation, such as leveling of land, boring test holes, or preliminary negotiations with contractors or architects." *Id*. at 199.

in section 5(3) of Measure 49. We reach that conclusion based on the context of the term "common law vested right" in section 5(3)—its relationship to two other parts of the section: the separate requirement that "claimant's use of the property complies with the waiver" and the dictate that the vesting be determined as of "the effective date of this 2007 Act [December 6, 2007]." We are required to adopt a construction of section 5(3) that gives effect to each of its particulars. *See* ORS 174.010 (in the construction of a statute "where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all"). Thus, a preferred construction of "common law vested right" is one that is not redundant of the considerations involved in determining whether "claimant's use of the property complies with the waiver" and in evaluating the extent of claimant's efforts as of December 6, 2007.

As just noted, the determination of whether "the claimant's use of the property complies with the waiver" partially mirrors the considerations that go into "whether the expenditures have any relationship to the completed project." That determination requires an assessment of whether the expenditures have been made on a specific property use—the particular development allowed under the waiver, as distinguished from some other use. Thus, all qualified section 5(3) claimants have made expenditures that are particular to the waived use. The relevance of the adaptability factor appears to be its interdependent effect on the numerator in the expenditure ratio factor and not its independent application to distinguish one vested rights claimant from another.

The good faith factor also does not work to sort meritorious "common law vested right[s]" from those less worthy. In the context of section 5(3) of Measure 49, each vested rights claimant proceeds in the development of property with permission of state and local zoning authorities in the form of Measure 37 waivers. Good faith, in that sense, is a given for most section 5(3) claimants.[9] But that quality again is

---

[9] This is not to say that all sums expended in reliance on a waiver would necessarily be made in good faith. *See Cyrus*, 226 Or App at 18-20 (Sercombe, J., concurring) (discussing lack of good faith in making expenditures while a Measure 37 waiver was being contested); *see generally Mason v. Mountain River Estates*, 73 Or App 334, 698 P2d 529, *rev den*, 299 Or 314 (1985) (vested rights not established by expenditures prior to final development approval by county).

ordained by the requirement in section 5(3) that "the claimant's use of the property complies with the waiver," and becomes duplicative and less relevant in assessing the non-redundant and separate requirement that "the claimant has a common law vested right."

Friends argues that claimant acted in bad faith in making expenditures (1) after June 15, 2007, with actual or imputed knowledge of the referral of Measure 49 or (2) after the measure's adoption on November 6, 2007, but before its effective date on December 6, 2007. Friends relies on the description in *Holmes* of the "good faith" vested right factor as going to "whether or not [the claimant] had notice of any proposed zoning or amendatory zoning before starting [claimant's] improvements." 265 Or at 198. The difficulty with Friends' analysis is that Measure 49, the proposed amendatory zoning, makes uses that have vested as of December 6, 2007, lawful. Section 5(3) allows the continuance of uses that have "vested * * * on the effective date of this 2007 Act." In other words, the expenditures at issue in this case were made in order to establish an allowed use.[10] An interpretation of section 5(3) that takes into account only those landowner's investments made before July 15, 2007 (the referral date for Measure 49) or November 6, 2007 (the adoption date for Measure 49) is plainly inconsistent with the express direction of section 5(3) that the vesting calculation be made "on the effective date of this 2007 Act" and not earlier. The timing of expenditures made before that date is irrelevant to an assessment of the claimant's good faith in particular or to the determination of the accrual of vested rights in general.

Thus, the phrase "claimant's use of the property complies with the waiver" requires that all claimants under section 5(3) proceed with some degree of good faith by acting consistently with the waiver and expend some money on the employment of land for a specific development that is allowed under the waiver and not some other use, a nonadaptable

---

[10] *See generally Cook*, 50 Or App at 82 n 4 (affirming the trial court's finding in vested rights determination, where a comprehensive plan change made a use unlawful, that " '[t]he record does not substantiate a "race to construct" or that intervenor had any notice or knowledge of the Comprehensive Plan or its import prior to incurring the aforementioned substantial expense' ").

expenditure that goes beyond generic preparation of the land for any use. Different text of the section—that the vesting calculation occurs "on the effective date of this 2007 Act"— makes the timing of expenditures up to that point immaterial to the vested rights calculus.

In determining whether a claimant meets the separate requirement in section 5(3) of a "common law vested right," the *Holmes* factors for determining the existence of a vested right that are otherwise applied through those other parts of section 5(3) (*i.e.*, good faith, expenditures on the waived use, particular timing of expenditures) are less probative as markers of a "common law vested right" than the factors that remain (*i.e.*, expenditure ratio, cost and location of project) in order to avoid an internal redundancy in the section. Therefore, what becomes *more* material to a section 5(3) determination are the other *Holmes* factors—the expenditure ratio, remaining issues about the adaptability of the investment to otherwise lawful uses under Measure 49, and the kind of project, including its location and costs. The text of section 5(3), then, prompts a more focused inquiry on whether a common-law vested right exists under that section than would be the normal case where none of the *Holmes* factors are predominant. *See Eklund*, 36 Or App at 81. Instead, the text and context of section 5(3) of Measure 49 makes a determination of the nature of the ultimate project (the location, extent, and type of residential development and its costs) and an assessment of the expenditure ratio particularly material to a vested rights decision under the measure.

Put another way, the equities of the *Holmes* inquiry in a Measure 49 vested rights determination involve a determination of the fairness of limiting a particular claimant to the residential development otherwise allowed under the measure (the homesites that could be obtained under sections 6, 7, and 9) given the investment already made in the specific residential development proposed to be vested. To a large extent, those equities, and the application of some of the *Holmes* factors, are common to all claimants under section 5(3) who meet the separate requirements of that section. That commonness suggests that distinction among claimants with vested rights and those without those rights must lie in differences about the individual degree of progress made to

complete the development, in the words of the Supreme Court, the extent to which a project is "partially finished." *Corey*, 344 Or at 466. As noted earlier, the degree to which a *Holmes* factor is material to a vested rights determination is affected by the strength or weakness of the equities that result from application of the remaining factors. Here, the equities of the remaining factors are not so compelling as to obviate the need to calculate and evaluate the expenditure ratio factor.

The remaining *Holmes* factors affect both the calculation and use of the expenditure ratio factor in this type of case. As noted earlier, our case law establishes that all of the *Holmes* factors are material to the determination of a vested right in the abstract and that the factors are interrelated to each other. Thus, the necessary consideration of the expenditure ratio factor involves a comparison of the project-related costs incurred in good faith as of December 6, 2007, with the likely costs of completing the particular development sought to be vested based on construction costs as of December 6, 2007. The appropriate degree of that progress is affected by application of the relevant *Holmes* factors to the facts of the particular case and by a comparison to the ratios used in *Holmes* and subsequent decisions. The failure of the reviewing court to require the county to define the extent and general cost of the project to be vested and to "consider [and] give proper weight" to the expenditure ratio factor in this way is legal error in this case because that consideration "might have affected the vested rights determination." *Union Oil Co.*, 81 Or App at 8.

In sum, the reviewing court erred in two respects in failing to remand to the county pursuant to the writ of review. First, the court should have remanded for a determination of the applicable zoning law at the time of claimant's acquisition of the property. Second, the court should have remanded for the county to determine the extent and general cost of the project to be vested and to give proper weight to the expenditure ratio factor in the totality of the circumstances of this case.

Reversed and remanded.