250 P.3d 933 (2011)
241 Or. App. 321
Joyce A. DAMMAN, an individual; Gary W. Damman, an individual; and Friends of Yamhill County, Inc., an Oregon non-profit corporation, Petitioners-Appellants,
v.
BOARD OF COMMISSIONERS OF YAMHILL COUNTY, an Oregon municipal corporation; Charles J. McClure and Ellen R. McClure, Trustees of the Charles J. McClure and Ellen R. McClure Trust, Respondents-Respondents.
CV080225; A141019.
Court of Appeals of Oregon.
Argued and Submitted January 13, 2010.
Decided March 2, 2011.
*934 Ralph O. Bloemers argued the cause and filed the briefs for appellants.
Steven W. Abel, Portland, argued the cause for respondents Charles J. McClure and Ellen R. McClure. With him on the briefs were Charles F. Hinkle, Sarah Stauffer Curtiss, and Stoel Rives LLP.
Before SERCOMBE, Presiding Judge, and WOLLHEIM, Judge, and RIGGS, Senior Judge.
SERCOMBE, P.J.
This case concerns issues similar to those decided in Friends of Yamhill County v. Board of Commissioners, 237 Or.App. 149, 238 P.3d 1016 (2010), rev. allowed, 349 Or. 602, 249 P.3d 123 (2011). That case evaluated the legal standards that a court uses to determine whether a claimant has a "common law vested right * * * to complete and continue" property development under section 5(3) of Measure 49, the referendum that replaced Measure 37 and altered its remedies for reduction in property value caused by a land use regulation. Here, the issue again is whether the circuit court applied the correct legal standards in its review of a county vested rights determination. The county determined that respondents Charles McClure and Ellen McClure (the McClures) had vested rights to continue residential uses in an approved subdivision under section 5(3) of Measure 49. A reviewing court upheld the vested rights determination, albeit on different reasoning than that used by the county. On appeal to this court, petitioners Damman and Friends of Yamhill County claim that the reviewing court erred in applying the legal standards that govern whether a land use right has vested. The McClures defend the court's decision, and also argue that vested rights exist under a theory rejected by the reviewing court. We conclude that the court erred in applying the applicable law in its review of the county decision and that the court should have remanded, rather than sustained, the county approval. Accordingly, we reverse and remand this case for further proceedings.
The legal context of this case is set out in Friends of Yamhill County, 237 Or.App. at 151-53, 238 P.3d 1016. The case arises in the context of an original law and its replacement, both adopted by the voters, that provide remedies to property owners whose property values are adversely affected by land use regulations. The original law, Measure 37, was adopted through the initiative process in 2004 and was initially codified at ORS 197.352 (2005). The law was subsequently amended, Oregon Laws 2007, chapter 424, section 4, and, in 2007, it was renumbered as ORS 195.305. Measure 37 required state and local governments to provide "just compensation" to a property owner when a governmental entity enacted or enforced a post-acquisition land use regulation that restricted the use of the property in ways that reduced its fair market value. Former ORS 197.352(1) (2005). Under the measure, that regulatory effect allowed an affected property owner to demand just compensation from the government. If a claimant qualified for relief, the governmental entity could respond in one of two ways: by paying the claimant the amount of the reduction of the property's value, former ORS 197.352(2) (2005), or by deciding to "modify, remove, or not to apply the land use regulation * * * to allow the owner to use the property for a use permitted at the time the owner acquired the property," former ORS 197.352(8) (2005). In *935 the subsequent adjudication of Measure 37 claims, the option to exempt property from otherwise applicable regulations and allow a specified use became known as a "Measure 37 waiver."
As we explained in Kleikamp v. Board of County Commissioners, 240 Or.App. 57, 60, 246 P.3d 56 (2010) (quoting Friends of Yamhill County 237 Or.App. at 152, 238 P.3d 1016), "Measure 37, however, was controversial. `The potential disruptive effect of [Measure 37] development, together with a lack of clarity in Measure 37's provisions, led to calls for a revision of the measure.'" The 2007 Legislative Assembly referred a substitute statute to the voters, Measure 49, legislation that narrowed the effects of Measure 37, including a reduction in the degree of residential development allowed under a Measure 37 waiver. The voters approved Measure 49, and it became effective on December 6, 2007.
Measure 49 redefined the adjudicatory processes, approval standards, and extent of relief for two classes of Measure 37 claims: those filed on or before June 28, 2007, and those filed thereafter. As to the former class of claims, section 5 of the measure limited the number of residential dwellings allowed under a granted waiver and otherwise allowed just compensation to a claimant as follows:
"(3) A waiver issued before [December 6, 2007] to the extent that the claimant's use of the property complies with the waiver and the claimant has a common law vested right on [December 6, 2007] to complete and continue the use described in the waiver."
We have construed that provision and the meaning of "common law vested right" in a number of opinions, beginning with Friends of Yamhill County. In that case, we concluded that the factors used to determine the existence of a vested right to complete and continue a land development project were set out in Clackamas Co. v. Holmes, 265 Or. 193, 198-99, 508 P.2d 190 (1973), and included (1) the ratio of project expenditures to the total project cost; (2) the good faith of the landowner in making the expenditures; (3) the relationship of the expenditures to the project as opposed to other uses of the property; and (4) the nature, location, and ultimate cost of the project. After a survey of vested rights cases, we determined that the case law
"establish[es] that all of the Holmes factors are material to the determination of a vested right and that they are interrelated. The inquiry is equitable in nature, requiring an evaluation of the progress of land development at the time of the downzoning, either in terms of a substantial start of construction of the vested use itself or substantial expenditures toward that particular end (as distinguished from expenditures for an otherwise lawful use of the property). The adaptability of expenditure factor is more significant * * * when the change of law does not entirely preclude the intended use. The degree of construction or expenditures necessary to be substantial depends on the proportion of those efforts or costs to the total project buildout or budget. Given the interrelatedness of the factors, the degree of construction or expenditure necessary to be substantial may be affected by the other Holmes factors (good or bad faith of landowner, size of project, the location of project with respect to other uses) and other equities, including the past conduct of the zoning authorities. Similarly, the degree to which a particular factor is material to a determination of vested rights is affected by the strength or weakness of the equities that result from the application of the remaining factors."
Friends of Yamhill County, 237 Or.App. at 165, 238 P.3d 1016.
The issue in this case is whether the McClures have a vested right to complete and continue the residential development of their property that was allowed under the issued Measure 37 waivers. Since 1967, the McClures have owned two adjacent parcels of land located near the urban growth boundary of the City of Newberg. County zoning and state policies regulate the allowed land uses of the property. The McClures obtained Measure 37 waivers from the state and the county to use their property subject to the land use regulations in *936 effect in 1967. The state waiver allowed "division of the 69.18-acre property into a maximum of forty 1-acre parcels [f]or * * * development of a dwelling on each parcel and * * * [allowed] development of the remaining property for commercial uses." The county waiver authorized the McClures to apply "to divide the subject property into residential and commercial lots of various sizes of less than one acre to over one acre and * * * to establish dwellings or other uses on the newly created lots."
The McClures began residential development of a portion of the properties subject to the Measure 37 waivers. They sought and obtained preliminary subdivision approval for a residential subdivision of 51 acres. The preliminary plat laid out 37 residential lots and two open space tracts. The McClures planned to develop the remainder of the property with a winery and a retirement home.
Following preliminary subdivision approval, the McClures entered into a development agreement with the City of Newberg. Under that agreement, the city agreed to extend water services to the properties and the McClures agreed to develop the properties with roads, water lines, and sewerage facilities constructed according to city standards and to support annexation of the properties to the city. The McClures also executed a performance agreement and irrevocable letter of credit with the county. That agreement obligated the McClures to complete road and utility improvements for the subdivision property, and to secure performance of that commitment with a $989,777 letter of credit from a bank. The letter of credit allows the county the right to use the funds to complete the improvements if the McClures default on their obligations. Largely on the basis of improvements to a perimeter road to the subdivision and the commitment and security to build subdivision public improvements, the McClures obtained final subdivision approval. They recorded the final plat of 36 residential lots on November 6, 2007. By December 6, 2007, the McClures had incurred $189,778 in expenditures for street and utility costs, and $416,087 in "soft costs" (planning, legal, engineering, and survey costs, costs of permits, and interest on borrowed money) toward development of the subdivision.
The McClures applied for and obtained certification of their vested rights to complete the residential subdivision under Measure 49 from a county hearings officer. The hearings officer concluded that the McClures' expenditures were "substantial" under the Holmes factors without regard to the proportion of those expenditures to the total project costs of developing the properties with homes.[1] On review, the circuit court upheld the vested rights determination.
Petitioners seek review of the circuit court judgment. Petitioners argue that the court erred in affirming the vested rights determination by the hearings officer. Petitioners claim that initiation of construction of the homes is necessary in order to vest that residential use under section 5(3) of Measure 49 and that the hearings officer should have assessed the ratio of countable expenditures to total project costs in order to determine the substantiality of the McClures' expenditures toward the proposed vested use. Petitioners assert that the vested rights determination should have been annulled by the circuit court because the potential ratio of expenditures was low, particularly in light of the purported bad faith of the McClures in making expenditures during the Measure 49 referral process.
This case was decided by the reviewing court together with four other vested rights review proceedings. We have issued opinions *937 in three of those companion cases: Friends of Yamhill County, Kleikamp, and Biggerstaff v. Board of County Commissioners, 240 Or.App. 46, 245 P.3d 688 (2010). Those opinions resolve petitioners' contentions on review. In Friends of Yamhill County, we rejected petitioners' assertions, reiterated in this case, that a claimant must start physical construction of residences in order to vest a residential use and that expenditures after the referral date of Measure 49 are necessarily made in bad faith and are not relevant to consideration of the expenditure ratio factor. 237 Or.App. at 166-68, 172, 238 P.3d 1016. Those conclusions were echoed in Kleikamp, 240 Or.App. at 64, 246 P.3d 56. We reject them here as well.
In all three cases, however, we agreed with petitioners' more fundamental pointthat, under these facts, consideration of the ratio of expenditures made to the total project costs is necessary in order to determine the existence of a vested right to develop the residential subdivision. As we put it in Biggerstaff:
"In Friends of Yamhill County, we reasoned that, in determining whether a vested right exists in this context, consideration of the expenditure ratio is `necessary.' 237 Or.App. at 178, 238 P.3d 1016. More recently, in Kleikamp * * *, we reiterated the fundamental underpinnings of our directive in Friends of Yamhill County. More specifically, we noted that, in all but the most exceptional case, `a landowner's proof of "substantial expenditures" is the sine qua non of a vesting determination' and that `[f]or vesting purposes, we understand that the concept of "substantial expenditures" * * * requires an examination of both the absolute amount expended and the percentage yielded by the expenditure ratio.' Kleikamp, 240 Or.App. at 66 [246 P.3d 56]."
240 Or.App. at 54, 245 P.3d 688.
The McClures argue that any error by the county in failing to calculate and assess the expenditure ratio is harmless because the county record shows that the total project expenditures, including the letter of credit commitment, was 11 percent of the costs of developing the subdivision and building homes of average cost, and that that ratio is sufficient, as a matter of law, to support the vested rights determination. Petitioners contend that the letter of credit obligation is not an "expenditure" and should not count in calculating the numerator of the expenditure ratio, and that the actual expenditures represent only four percent of the costs of developing a subdivision with average homes. We conclude that there is insufficient evidence in the county record to establish the project costs, i.e., the costs of the development contemplated by the McClures on December 6, 2007, and that further evidence is needed to determine the denominator of the expenditure ratio. Similarly, whether the letter of credit obligation qualifies as an expenditure also requires factual determinations by the county. Given those uncertainties about both the numerator and the denominator of the expenditure ratio, we cannot say that the failure by the county to address the expenditure ratio factor in assessing the existence of a vested right was inconsequential or harmless.
The project costs in this case would not include the costs of average homes. The McClures contemplated developing the project, according to the development agreement with the city,
"to enhance the Newberg area and provide an attractive and suitable entrance to the City and provide opportunities for housing and other uses not currently available in Newberg [and] * * * to develop the Property in a manner that offers exceptional quality and design while * * * providing a superior quality of residential environment unequaled in the area."
As we observed in Kleikamp,
"a cogent assessment of total project cost (and, concomitantly, the expenditure ratio) will, in turn, require particular identification of the development that the property owner sought to vest as of December 6, 2007. For example, a 15  lot residential subdivision, depending on lot sizes and applicable zoning, could include anything from modest homes to mansions, with consequent substantial differences in the total cost of construction. Thus, it is incumbent on the property owner to establish the *938 likely total project cost in relation to the size and character of the structures that the owner contemplated building in compliance with a Measure 37 waiver as of December 6, 2007."
240 Or.App. at 66-67, 246 P.3d 56. It was necessary, then, for the county to determine the cost of the contemplated residential development in order to assess the McClures' vested rights.[2]
The McClures may be correct, however, in advocating that the letter of credit obligation qualifies as a project "expenditure" under the Holmes analysis. The Holmes case references the test as "substantial costs toward completion of the job must have been incurred." 265 Or. at 197, 508 P.2d 190. The opinion later refers to "expenditures incurred," id. at 198, 508 P.2d 190, and "expenses incurred," id. at 201, 508 P.2d 190. The meaning of "incur" is straightforward"to meet or fall in with (as an inconvenience): become liable or subject to: bring down upon oneself." Webster's Third New Int'l Dictionary 1146 (unabridged ed. 2002). "Expend" means "to pay out or distribute: SPEND," id. at 799; whereas "expenditure" means "the act or process of expending" and can mean, in accrual basis accounting, "an outlay or the creation of a liability for an asset or expense item," id. at 800. The ordinary meaning of an "incurred expenditure" includes a certain liability in the process of expending or paying out money where the spending is likely to occur.
As we observed in Friends of Yamhill County, the common-law vested rights "inquiry is equitable in nature, requiring an evaluation of the progress of land development at the time of the downzoning." 237 Or.App. at 165, 238 P.3d 1016. The equities of allowing vesting to a developer on the basis of cash outlays differ little from those created when a developer assumes an irrevocable financial obligation. Whether the letter of credit qualifies, then, as an "incurred expenditure" depends upon its similarity to a payoutto the certainty of the McClures' liability, whether it is revocable or contingent, and the likelihood of the spending, measured as of the vesting date of December 6, 2007.[3] The actual letter of credit is not in the county record, making that assessment difficult on appellate review. Rather, that assessment can be made on remand.
Thus, the hearings officer and the reviewing court determined that it was unnecessary to establish the denominator (the total project costs) of the expenditure ratio in evaluating the substantiality of the McClures' expenditures for purposes of vesting. That was error, and the reviewing court must remand the proceedings back to the county for that evaluation. In that evaluation, more focused findings are required on the numerator and denominator of the expenditure ratio factor.
The McClures cross-assign error to the reviewing court's rejection of their contention that the McClures' "right to complete and continue the use described in their Measure 37 waivers vested as a matter of law when the County granted final plat approval." In essence, the McClures contend that their final subdivision approval was not affected by *939 the subsequent enactment of Measure 49 and that the lot division was sufficient to vest residential development of the property.
As to the retroactive effect of Measure 49 on Measure 37 waivers and actions taken under those waivers, the Supreme Court has explained, "[a]n examination of the text and context of Measure 49 conveys a clear intent to extinguish and replace the benefits and procedures that Measure 37 granted to landowners." Corey v. DLCD, 344 Or. 457, 465, 184 P.3d 1109 (2008). The court further noted that "Measure 49 by its terms deprives Measure 37 waiversand all orders disposing of Measure 37 claimsof any continuing viability, with a single exception [of the vested rights determination under section 5(3)]." Id. at 466-67, 184 P.3d 1109 (emphasis in original). Thus, Measure 49 precludes prospective residential development allowed by waivers granted under Measure 37. Moreover, it is not clear that subdivision lot approval by the county carries with it any vested right to develop the lots for a particular use or at any specific density of development. Because the McClures' Measure 37 waivers no longer are effective, current zoning and the residential use allowances under Measure 49 control residential development and building permits for the subdivision. The McClures did not explain how subdivision lot approval precludes the operation of those zoning controls to land use development of the subdivision and the reviewing court did not err in failing to supply that reasoning in its oversight of the county decision. Cf. ORS 92.040(2) (laws in effect at time of subdivision application govern subsequent construction on property for land within urban growth boundaries); Pete's Mountain Homeowners Assn. v. Clackamas Cty., 227 Or.App. 140, 204 P.3d 802 (2009) (Measure 37 waivers and the application of the "goal-post statute," requiring application of standards existing at time of application to permit or zone change, superseded by Measure 49).
Reversed and remanded.
NOTES
[1] The hearings officer reasoned:

"The issue of whether the applicants' expenses should be compared to a `completed use' as homesites or as completion of every single dwelling permitted by Yamhill County, is discussed throughout these findings. If the cost of constructing all of the proposed homes is the measure, there is the additional question of whether to consider the cost of the types of homes the applicant is contemplating, the cost of a legal, habitable dwelling, an `average cost' or some other measure.
"This is a speculative analysis that may be necessary in other cases in which this factor deserves to be given more weight, but is not necessary to properly address [the ratio test] in this case."
[2] The hearings officer, reviewing court, and the parties assume that the relevant project, for vesting analysis, is the residential subdivision. Given the contentions of the parties, we have no occasion to disturb that assumption. We note, however, that section 5(3) of Measure 49 pertains to "a common law vested right * * * to complete and continue the use described in the waiver." (Emphasis added.) The use described in the McClures' waiver is for residential and commercial development. On the other hand, the allowed just compensation under section 5(3) is "as provided in: * * * [a] waiver * * * to the extent that" the claimant's property use complies with the waiver and a common-law vested right exists, perhaps implying that some degree of the use provided in the waiver can be allowed. (Emphasis added.) We need not decide if section 5(3) permits a partial vesting or not, given the circumstances of this case.
[3] At the time of final plat approval, a letter of credit can substitute for the actual provision of water or sewer services to the subdivision lots when the letter of credit is "irrevocable" and assures "that a domestic water supply [or `sewage disposal'] system will be installed by or on behalf of the subdivider to the lot line of each and every lot depicted in the proposed subdivision plat." ORS 92.090(4)(b) (water supply system); ORS 92.090(5)(b) (sewage disposal system). Thus, as a matter of subdivision law, the unconditional nature of the letter of credit and the inevitability of the improvement are important as well.