Argued and submitted January 20, judgment vacated and remanded
December 29, 2011

W. Leigh CAMPBELL,
Ceille W. Campbell, and Donald B. Bowerman,
*Plaintiffs-Appellants,*

*v.*

CLACKAMAS COUNTY,
*Defendant-Respondent,*

*and*

FRIENDS OF CLACKAMAS COUNTY,
an Oregon non-profit corporation;
John Messner; Judy Messner;
Tom Bray; Jeri Bray;
Dave Krevanko; Terri Krevanko;
Fritz Von Tagen; and Denise Von Tagen,
*Defendants-Intervenors-Respondents.*

Clackamas County Circuit Court
CV07120049; A139641 (Control)

W. Leigh CAMPBELL,
Ceille W. Campbell, and Donald B. Bowerman,
*Plaintiffs-Appellants,*

*v.*

STATE OF OREGON,
*Defendant-Respondent,*

*and*

FRIENDS OF CLACKAMAS COUNTY,
an Oregon non-profit corporation;
John Messner; Judy Messner;
Tom Bray; Jeri Bray;
Dave Krevanko; Terri Krevanko;
Fritz Von Tagen; and Denise Von Tagen,
*Defendants-Intervenors-Respondents.*

Clackamas County Circuit Court
CV07120048; A139642

270 P3d 299

Kristen S. David argued the cause for appellants. On the opening brief were M. Elizabeth Duncan, Charles R. Markley, and Greene & Markley, P.C. With her on the reply brief was Bowerman and David, PC.

D. Daniel Chandler, Senior Assistant County Counsel, argued the cause and filed the briefs for respondent Clackamas County.

Stephanie L. Striffler, Senior Assistant Attorney General, argued the cause for respondent State of Oregon. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Ralph O. Bloemers argued the cause and filed the brief for respondents Friends of Clackamas County, John Messner, Judy Messner, Tom Bray, Jeri Bray, Dave Krevanko, Terri Krevanko, Fritz Von Tagen, and Denise Von Tagen.

Before Sercombe, Presiding Judge, and Brewer, Chief Judge, and Carson, Senior Judge.

SERCOMBE, P. J.

## SERCOMBE, P. J.

This case concerns whether plaintiffs' rights to develop a residential subdivision had vested under Measure 49. In 1969, plaintiffs acquired a 62-acre tract of land in rural Clackamas County. At that time, the property's zoning allowed residences to be built on one-acre parcels. More restrictive zoning was subsequently applied that confined the uses of the property to agricultural and forestry uses. Pursuant to Measure 37, *former* ORS 197.352(8) (2005), *amended by* Or Laws 2007, chapter 424, section 4, *renumbered as* ORS 195.305 (2007), plaintiffs obtained county and state waivers of the land use regulations that inhibited residential development of the property. Plaintiffs sought a judgment declaring that their actions taken under those waivers were sufficient to vest rights to develop the property as a residential subdivision under section 5(3) of Measure 49. Or Laws 2007, ch 424, § 5(3). That part of Measure 49 permits development allowed by a Measure 37 waiver "to the extent that the claimant's use of the property complies with the waiver and the claimant has a common law vested right" as of December 6, 2007, to complete and continue the development. *Id.*

Following a trial, the court applied the standards for a common-law vesting set forth in *Clackamas Co. v. Holmes*, 265 Or 193, 198-99, 508 P2d 190 (1973), and denied the requested relief for two alternative reasons: first, because the expenditures to develop the property were not incurred by plaintiffs but were incurred by a developer acting on its own behalf; and, second, the expenditures were insufficient to vest development rights given the costs of the entire project and the application of the other *Holmes* vesting criteria.

Plaintiffs appeal a limited judgment denying their declaratory relief claim, contending that both of the reasons advanced by the court were improper bases for denying the relief sought. Defendant Clackamas County cross-assigns error to the court's determination that plaintiffs acted in good faith. The county argues that plaintiffs' purported bad faith was an alternative reason to deny the requested declaration of vested rights.

We have treated declaratory judgment proceedings to determine vested rights as equitable in nature. *See*

*Milcrest Corp. v. Clackamas County*, 59 Or App 177, 179 n 2, 650 P2d 963 (1982); *Webber v. Clackamas County*, 42 Or App 151, 153 n 1, 600 P2d 448 (1979) (so stating).[1] Accordingly, we apply a *de novo* standard of review in this case. We conclude that plaintiffs' rights to develop the subdivision had not vested and remand for a new declaratory judgment to that effect.[2]

As noted, Measure 37, an initiative measure adopted in 2004, required state and local governments to compensate property owners for the reduced value of property caused by a post-acquisition downzoning. That compensation could occur by either paying the amount of the reduction in value or by deciding to "modify, remove, or not to apply the land use regulation * * * to allow the owner to use the property for a use permitted at the time the owner acquired the property." *Former* ORS 197.352(8). Plaintiffs sought and obtained Measure 37 waivers of the zoning restrictions that limited residential use from the county and the state. The state's waiver allowed "division of the 62.7-acre property into approximately one-acre parcels [and] * * * development of a single-family dwelling on each parcel."

Plaintiffs proceeded to develop the property for those uses. In the course of that development, on November 7, 2007, the voters adopted Measure 49. Measure 49 limited the remedies for past and future claims for compensation for the lost fair market value of downzoned property. For existing Measure 37 claims, instead of a broad waiver of regulations, sections 5(1) and (2) of Measure 49 allowed the property owner the right to develop the affected property with a specified number of residential dwellings, depending upon the location of the property. Alternatively, for property on which

---

[1] The notices of appeal in these cases were filed on August 7, 2008. Accordingly, the *de novo* review required by *former* ORS 19.415 (2007) applies. That statute was amended in 2009 to provide that *de novo* review is discretionary with the court; that amendment applies to appeals in which the notice of appeal was filed on or after June 4, 2009. Or Laws 2009, ch 231, §§ 2-3.

[2] The issue of whether a vested rights determination is a question of law or fact appears to be unsettled. *See Friends of Yamhill County v. Board of Commissioners*, 351 Or 219, 243 n 17, 264 P3d 1265 (2011). Because we review *de novo* under the particular procedural posture of this case, as in *Friends of Yamhill County*, we need not decide that question.

the owner had begun the development permitted by a Measure 37 waiver, section 5(3) allowed development

> "as provided in * * * [a] waiver issued before [December 6, 2007,] to the extent that the claimant's use of the property complies with the waiver and the claimant has a common law vested right on [December 6, 2007,] to complete and continue the use described in the waiver."

We have issued a number of recent opinions describing and applying the factors used to determine the existence of a common-law vested right under section 5(3). As we recently explained in *Kleikamp v. Board of County Commissioners*, 240 Or App 57, 60, 246 P3d 56 (2010),

> "[i]n *Friends of Yamhill County* [*v. Board of Commissioners*, 237 Or App 149, 238 P3d 1016 (2010), *aff'd*, 351 Or 219, 264 P3d 1265 (2011)], we examined the meaning of the term 'common law vested right' as used in section 5(3) of Measure 49. In doing so, we surveyed Oregon case law, including the Supreme Court's decision in *Clackamas Co. v. Holmes*, 265 Or 193, 198-99, 508 P2d 190 (1973), in which the court established factors for determining whether a common law vested right exists in a particular case, including (1) the ratio of development expenditures to the total project cost; (2) whether the landowner's expenditures were made in good faith; (3) whether the expenditures are related to the completed project or could apply to other uses of the property; and (4) the nature, location, and ultimate cost of the project."

The issue in this case is whether plaintiffs' efforts to develop the property were sufficient to create a common-law vested right on December 6, 2007, to complete and continue a residential subdivision on the parcels. By that time, plaintiffs had entered into a development services agreement with Root Holdings, LLC, and its owner, Gordon Root (the developer). Among other things, that agreement obligated the developer to obtain the required engineering and planning approvals for a subdivision and construct the necessary site improvements, provided that the "necessary and reasonable costs for such entitlements and site development will be borne by the Developer," and set out a method of dividing the proceeds of lot sales between plaintiffs and the developer.

The developer obtained preliminary subdivision approval for a 41-lot subdivision on June 18, 2007, naming the project "Tumwaters at Pete's Mountain." That approval was appealed to LUBA. The board remanded the approval back to the county on November 15, 2007. *Pete's Mtn. Home Owners Assn. v. Clackamas County*, 55 Or LUBA 287 (2007). Between the time of the preliminary subdivision approval and November 7, 2007, and during the pendency of the LUBA proceeding, the developer cleared and graded the parcels and constructed the road beds for the subdivision. That project involved considerable cut and fill activity on the hilly terrain, moving 83,000 cubic yards of earth and laying down 475 truckloads of rock for the road base and erosion control. Work stopped on the project when Measure 49 was adopted.

In December 2007, plaintiffs filed complaints against the county and the state. Those complaints were amended in early 2008. The amended complaints sought declaratory relief on the Measure 49 vested rights claims, specific performance and other remedies under Measure 37, and compensation for an inverse condemnation. At the conclusion of a May 2008 trial on the declaratory judgment claims, plaintiffs and the developer amended the development services agreement.

In a letter opinion, the trial court declined to issue declaratory relief in favor of plaintiffs for two reasons. First, the court found that, notwithstanding the development services agreement, "[p]laintiffs have not actually spent any money to develop the property" so as to allow vesting because of substantial expenditures on the use by the landowners. Alternatively, if the developer's expenditures were relevant under a *Holmes* vesting analysis, the court found that there was insufficient progress toward completion of the improved subdivision:

"Developer has spent $1,295,869. The total cost of building approximately 40 homes on the available lots and completing the infrastructure already contemplated is a minimum of $30,000,000. I arrived at that figure after concluding from the evidence that the type of homes that can reasonably be built on these lots will cost over $750,000 including the materials and labor for the house, the driveway, the landscaping, the well, and the cost of the development

attributable to each lot. Even if the land sells for $150,000, as contended by Plaintiffs, the sale price of the average home in the development will be $900,000. * * * I am also convinced that prospective buyers for a home in this area with 1 1/2 acres of land and similar lots on all sides will be able and willing to spend more than $900,000. For purposes of the *Holmes* analysis, the ratio is 1/23. Plaintiffs have not vested."

The court also found that the expenditures were adaptable to the development of three large homesites (the extent of development under section 5(1) of Measure 49 contemplated at the time of trial) and that plaintiffs operated in good faith. The court entered the limited judgment in favor of the county, the state, and intervenors on plaintiffs' declaratory judgment claim. The judgment incorporates the court's letter opinion and further provides that "[p]laintiffs are not entitled to declaratory judgment." Plaintiffs appeal that limited judgment.

On review, plaintiffs dispute both bases for the trial court's conclusion that no vested right to an improved subdivision was proved. As explained below, we conclude that a declaration should be entered that plaintiffs had no vested rights to complete and continue an improved subdivision because the expenditures on the project were insubstantial as of December 6, 2007, in light of the *Holmes* factors. Given that conclusion, plaintiffs' rights would not be affected by any supplemental determination of whether the developer's expenditures count in applying the expenditure ratio test. The judgment on remand should be limited to the sufficiency of the expenditures to vest the alleged development rights.

We begin and end, then, with the trial court's determination that there was insubstantial progress toward completion of the subdivision project for development rights to vest. Beginning with *Friends of Yamhill County*, we have decided a number of vested rights cases under section 5(3) of Measure 49. In that case, we reasoned that

"all of the *Holmes* factors are material to the determination of a vested right and that they are interrelated. The inquiry is equitable in nature, requiring an evaluation of the progress of land development at the time of the downzoning, either in terms of a substantial start of construction

of the vested use itself or substantial expenditures toward that particular end (as distinguished from expenditures for an otherwise lawful use of the property). * * * The degree of construction or expenditures necessary to be substantial depends on the proportion of those efforts or costs to the total project buildout or budget. Given the interrelatedness of the factors, the degree of construction or expenditure necessary to be substantial may be affected by the other *Holmes* factors (good or bad faith of landowner, size of project, the location of project with respect to other uses) and other equities, including the past conduct of the zoning authorities. Similarly, the degree to which a particular factor is material to a determination of vested rights is affected by the strength or weakness of the equities that result from the application of the remaining factors."

237 Or App at 165.

On review, that reasoning was adopted by the Supreme Court. The court held that,

"when a landowner seeks to establish a vested right because 'substantial costs toward completion of the job * * * have been incurred,' only one of the *Holmes* factors entails consideration of the 'costs * * * incurred'—namely, 'the ratio of expenses incurred to the total cost of the project.' That factor provides an objective measure of how far the landowner has proceeded towards completion of the construction. As such, we think it provides the necessary starting point in analyzing whether a landowner has incurred substantial costs toward completion of the job, although the other *Holmes* factors will bear on whether the costs incurred are substantial enough to establish a vested right under section 5(3)."

*Friends of Yamhill County*, 351 Or at 242-43 (citation omitted). The court later reemphasized that, after determining the expenditure ratio, it is necessary to examine whether, "in light of the other *Holmes* factors, [the expenditure ratio is] substantial enough to establish a vested right." *Id.* at 247. The court cautioned that

"the ratio provides only the starting point for the analysis. It is not the sole factor to be considered, nor will it necessarily be the dispositive factor; that is, there is not some specific percentage which must always be present before the right to complete construction will vest. For example,

*Holmes* states that the 'ultimate cost' also matters in the analysis. 265 Or at 199. As we understand *Holmes*, it lists the 'ultimate cost' of the project separately from the expenditure ratio (which incorporates the cost of the project) because the weight to be given the expenditure may vary depending on the ultimate cost. More specifically, * * * when the ultimate cost of a project runs into millions of dollars, an expenditure may be substantial even though it is only a small percentage of the projected cost."

*Id.* at 247-48 (footnote omitted). We earlier concluded, to the same effect, that, "[f]or vesting purposes, we understand that the concept of 'substantial expenditures' * * * requires an examination of both the absolute amount expended and the percentage yielded by the expenditure ratio." *Kleikamp*, 240 Or App at 66.

In those cases where, as here, the Measure 37 waivers were obtained in order to subdivide the property and construct residences, the project cost—the denominator of the expenditure ratio—includes the costs of constructing residences on the property. As we noted in *Fischer v. Benton County*, 244 Or App 166, 174, 260 P3d 647 (2011),

"[s]uch an assessment of total project cost (and concomitantly, the expenditure ratio) is necessarily predicated on a proper assessment of the 'use' that is described in the waiver—that is, the 'use' that the landowner seeks to vest under section 5(3) of Measure 49. In *Friends of Yamhill County*, where the claimant had obtained waivers to subdivide his property and construct residences, we reasoned that, for purposes of section 5(3) 'use' refers to 'the actual employment of land for a residential purpose.' 237 Or App at 167. Stated differently, in a case such as this in which a claimant has obtained Measure 37 waivers to subdivide property and construct residential dwellings on the resulting lots, the pertinent 'use' is not simply the subdivision of the property. Instead, under those circumstances, the 'use' for purposes of determining the total project cost is the subdivision of the property *and* the establishment of residences on the resulting lots. *Id.*"

(Emphasis in original.)

Because the vested rights determination under Measure 49 is made as of December 6, 2007, the effective date

of the measure, "it is incumbent on the property owner to establish the likely total project cost in relation to the size and character of the structures that the owner contemplated building in compliance with a Measure 37 waiver as of December 6, 2007." *Kleikamp*, 240 Or App at 66-67. Moreover, the likely total project cost is " 'based on construction costs as of December 6, 2007.' " *Id.* at 66 (quoting *Friends of Yamhill County*, 237 Or App at 178) (emphasis omitted); *see also Damman v. Board of Commissioners of Yamhill County*, 241 Or App 321, 329, 250 P3d 933 (2011) (same).

Applying those principles to the evidence presented here, we conclude that plaintiffs failed to prove an entitlement to a vested right to complete and continue the 41-lot residential development use. The developer incurred $1,295,869 in costs between the start of the project in 2005 and December 6, 2007. Those costs were spent to design and engineer the subdivision, obtain preliminary approval for a 41-lot subdivision, remove drainage tiles from the land, grade the homesites and roads, lay down crushed rock for roadbeds and erosion control, and defend the subdivision approval before LUBA. The costs to complete preparation of the site for housing and construct off-site road improvements were $1,699,250. Thus, the expected costs to develop the lots were $2,995,119 or $73,052 per lot.

We agree with the trial court's implicit determination that, as of December 6, 2007, plaintiffs and the developer intended to market the lots for development of expensive homes. The June 2006 development services agreement recited the developer's qualifications "to develop the property from its current state into an upscale single family residential subdivision." At a neighborhood group meeting in early 2007, the developer represented that the houses in the subdivision would average $2,900,000 in price and 6,000 square feet in size, and would "increase property values in the area." The developer testified that he originally planned to market the lots at a price of $300,000 to $500,000 in order to construct a higher-end development of expensive homes. Lot reservations were sold to high-end builders. As part of the subdivision approval process, shortly before the enactment of Measure 49, the developer filed draft covenants, conditions, and restrictions of record with the county in the fall of 2007

that limited the dwellings to a minimum size of 4,300 square feet.

Construction of homes priced in the $1 million to $2 million range would have been consistent with the character of the immediate neighborhood. The state's appraiser witness, Herman, opined that

> "[t]he land use character of the immediately surrounding area is clearly oriented toward luxury class detached single-family residences that are typically situated upon 1.0 to 5.0 acre homesites. The Oregon Golf Club facility, which is a private country club and golf course, is a significant positive influence upon the overall desirability of the surrounding area as is association with higher value homes, a majority of which fall in the $1,000,000 to $5,000,000 price range."

Consistently with that opinion, a county planner testified that the average cost of constructing new homes in the area between January 1, 2007 and May 14, 2008, as reflected in building permit applications, was $873,768.

Hartwell, a custom-home builder, testified that it would cost about $590,000 to construct a 4,300-square foot home at the Tumwater subdivision. Thus, the evidence in the record suggests that the minimum cost of constructing a higher-end residence for the Tumwater subdivision was $663,052 ($590,000 home construction costs plus $73,052 lot development costs), for a total 41-home project cost of $27,185,132. Using that figure as the denominator, and $1,295,869 as the numerator, the expenditure ratio is 4.7 percent.

Plaintiffs presented evidence that the deterioration of the housing market during 2007 to mid-2008 would have prompted construction of homes at a lower cost of $345,000 per home, increasing the expenditure ratio to approximately 7.5 percent.[3] We are not persuaded, however, that plaintiffs' plans for the development in December 2007 anticipated the

---

[3] This ratio assumes that the costs to construct the house, well, and septic system would be $345,000 and the costs of lot development were $73,052 per lot, for a total cost of $418,052 per home times 41 lots for a total project cost of $17,140,132. That sum divided into the incurred costs of $1,295,869 yields an expenditure ratio of 7.5 percent.

changed market conditions that existed in May 2008. There was no objective evidence that plaintiffs' plans for the property changed by December 2007 from what it had been at the time that the lot reservations were taken in 2006, the project was promoted to the neighborhood group in February 2007, and the covenants were developed and reviewed in October 2007.

An expenditure ratio of 4.7 percent is insufficient to establish a common-law vested right to complete the development in light of the other *Holmes* factors. *See Friends of Yamhill County*, 351 Or at 243 ("The other *Holmes* factors will bear on whether the costs incurred are substantial enough to establish a vested right."). Costs were incurred to construct the subdivision road system during the time that the design of the roads was being challenged in the appeal of the subdivision preliminary approval to LUBA. *See Cyrus v. Board of County Commissioners*, 226 Or App 1, 18-20, 202 P3d 274 (2009) (Sercombe, J., concurring) (construction of project during time of an appeal of the project permit approval is not undertaken in "good faith" under *Holmes*). That fact diminishes the otherwise good faith of plaintiffs. Some of the improvements could be used to develop and service the nine homesites otherwise allowed by Measure 49 on the parcels.[4] Those equities suggest that a low expenditure ratio of less than 5 percent is insufficient to vest rights to develop the entire subdivision. *Cf. Friends of Polk County v. Oliver*, 245 Or App 680, 264 P3d 165 (2011) (expenditure ratio of 5.6 percent sufficient based on expenditures of $1,087,648 for project planning and roadway where the plaintiffs had incurred an additional lost benefit worth $680,000).

As noted, the judgment under review provided that "[p]laintiffs are not entitled to declaratory judgment." However, the correct form of relief is to enter a declaration that plaintiffs had no vested rights to complete and continue an improved subdivision because the expenditures on the

---

[4] The county asks that we take judicial notice of the April 2010 Department of Land Conservation and Development orders authorizing nine homesites on the three parcels. Plaintiffs do not object. We, therefore, consider those orders in our evaluation of the merits of this case.

project were insubstantial as of December 6, 2007, in light of the *Holmes* factors. *See Curry v. Clackamas County*, 240 Or App 531, 536, 248 P3d 1, *rev den*, 350 Or 573 (2011) (dismissal of declaratory judgment claim held improper and claim remanded for issuance of judgment declaring rights in accordance with this court's view of the merits of the controversy).

Judgment vacated and remanded.