JAMES, J.
*243 Carr and Jeanne Biggerstaff, Friends of Yamhill County (FOYC), and the State of Oregon (jointly, appellants) appeal a judgment entered in a writ-of-review proceeding that affirmed Yamhill County's determination that Ralph and Norma Johnson (claimants) have a vested right under section 5(3) of Ballot Measure 49 (2007) to complete a 41-lot subdivision on their property.[1] Appellants *551 contend, among other things, that the writ-of-review court erred in affirming the county's determination that claimants had a vested right to complete the subdivision. For the reasons explained below, we agree. Accordingly, we reverse and remand.
I. BACKGROUND
We state the facts consistently with the uncontested explicit and implicit factual findings in the county's vesting determination, Friends of Yamhill County v. Board of County Commissioners , 237 Or. App. 149, 153, 238 P.3d 1016 (2010), aff'd , 351 Or. 219, 264 P.3d 1265 (2011) ( Friends I ), and with the undisputed facts set out in our previous opinion in this case. Claimants own property in Yamhill County that is currently zoned for farm use. In 2005, pursuant to Ballot Measure 37 (2004),[2] claimants sought, and received, waivers of land use regulations from Yamhill County and from the state. In the waivers, the county and the state agreed not to apply regulations preventing claimants from subdividing and building dwellings on their property.
Pursuant to the waivers, in 2006, claimants obtained preliminary approval from the county to subdivide their *244 property into 41 residential lots. Claimants spent "over $ 1 million to develop the property and recorded the final subdivision plat for the development before Measure 49 became effective on December 6, 2007." Biggerstaff v. Board of County Commissioners , 240 Or. App. 46, 49, 245 P.3d 688 (2010). Claimants' expenditures included, along with costs of preparing the land for development, the cost of constructing "several extremely small 'dwellings' " of approximately 10 by 12 feet in size, just before Measure 49 took effect. Id. However, as claimants' counsel acknowledged at oral argument in this case, claimants never planned to construct, or hire anyone else to construct, houses for buyers to actually live in; they intended only to sell lots, on which third parties would construct houses. In the fall of 2007, claimants sold four of the lots.
When Measure 49 took effect, extinguishing claimants' Measure 37 waivers, claimants applied to the county for a determination that, under section 5(3) of Measure 49, they had a vested right to complete and continue the subdivision. See Friends of Yamhill County v. Board of Commissioners , 351 Or. 219, 228, 264 P.3d 1265 (2011) ( Friends II ) (explaining that Measure 49 extinguished Measure 37 waivers and required claimants to "choose among three pathways: the express pathway, the conditional pathway, and the vested rights pathway"). The county determined that claimants had a vested right to complete the subdivision, and the circuit court affirmed that determination on a writ of review.
The Biggerstaffs, who are neighbors of claimants, appealed. We concluded that the county had misconstrued the law and, accordingly, we reversed the writ-of-review judgment and remanded for reconsideration. Biggerstaff , 240 Or. App. at 56, 245 P.3d 688. On remand, claimants applied to the county for a vested rights determination for a second time, and, in 2011, the county again determined that they had a vested right to complete and continue the subdivision. While that decision was before the circuit court on a writ of review, the Supreme Court decided Friends II , in which it provided guidance about how to apply the factors that the court had previously established in *245 Clackamas County v. Holmes , 265 Or. 193, 508 P.2d 190 (1973), as the guideposts for vested rights analysis.
One of those factors is the expenditure ratio, which is the ratio between the costs that the landowner incurred toward construction *552 of the planned development before the change in the law and the estimated cost of constructing the whole planned development. Friends II , 351 Or. at 246, 264 P.3d 1265 ; see also id. at 235-43, 264 P.3d 1265 (explaining vested rights analysis). To determine the ratio, the county must find "two historical facts: (1) the costs that [the claimant] incurred to construct the planned development and (2) the estimated cost of the planned development." Id. at 246, 264 P.3d 1265. Dividing the claimant's costs incurred by the total estimated cost of the planned development yields a percentage, which "provides an objective measure of how far the landowner has proceeded towards completion of construction and thus serves as an initial gauge of whether the landowner has proceeded far enough that he or she has a vested right to complete construction." Id. at 245, 264 P.3d 1265.
After the Supreme Court decided Friends II , claimants requested another remand to allow the county to conduct the vesting analysis consistently with that opinion. On remand, claimants again sought a vested rights determination from the county. In support of their contention that their expenditures represented a sufficient percentage of the total project cost to support a vested right, they relied on a purchase agreement submitted by a builder, which estimated that the cost to build the type of home that was likely to be built on the lots in the subdivision, as of December 2007, would have been $ 344,018.69. The county accepted that testimony and, multiplying that amount by 40 and adding other development costs, determined that the total project cost, the denominator of the expenditure ratio, was $ 15,017,937.50. Applying a numerator of $ 1,257,190.74, which represented claimants', the county determined that claimants had spent 8.32 percent of the total project cost. After considering the other Holmes factors, the county determined that claimants had a vested right to complete and continue the subdivision.
The Biggerstaffs and FOYC sought writs of review in the circuit court, the proceedings were consolidated, and *246 the state and claimants intervened.[3] As relevant to this opinion, appellants raised two arguments. First, they contended that ORS 215.130, which requires nonconforming uses to be continuous, and a county ordinance implementing that statute applied to, and extinguished, claimants' claim under section 5(3) of Measure 49. Second, they argued that the county had misconstrued the law when it relied on the builder's testimony about the likely cost of building the homes in the subdivision. In their view, that evidence showed the amounts that buyers of lots would have spent building homes and not the cost of houses that claimants themselves planned to build. They asserted that the fact that claimants never planned to build houses themselves was fatal to their claim under section 5(3) of Measure 49, and the builder's testimony could not assist them.
The circuit court rejected those arguments. As to the first argument, it reasoned that ORS 215.130 did not apply in this vested rights proceeding. As to the second argument, it held that that claimants had shown the denominator of the expenditure ratio through the builder's testimony about the likely cost of building homes in the subdivision, regardless of "whether [claimants] personally constructed the buildings, did so in conjunction with third parties[,] or third parties undertook the construction on their own after purchase of a lot with a vested interest to complete construction that ran with the land." Based on that reasoning, the court concluded that the county had not erred in determining that claimants had a vested right to complete and continue the development.
The Biggerstaffs and FOYC, on one hand, and the state, on the other, appealed, and we consolidated the appeals. Appellants renew their arguments from below, and claimants *553 and the county defend the circuit court's reasoning. *247 II. ANALYSIS
In an appeal from a writ of review where the parties' arguments raise only questions of law, as they do here, we review for errors of law. ORS 195.318 (allowing challenges to county vested rights decisions under Measure 49 by way of writ of review); ORS 34.040(1)(d) (in a writ-of-review proceeding, the circuit court must determine whether the county "[i]mproperly construed the applicable law"). As explained below, we conclude that ORS 215.130 does not affect claimants' claim. However, we conclude that claimants did not show a "vested right to complete and continue the use described in the waiver ," Measure 49 § 5(3) (emphasis added), because claimants' planned development, subdividing the property and selling buildable lots, was not something that claimants could do pursuant to their Measure 37 waivers.
A. Discontinuation
At the outset, we reject appellants' argument that ORS 215.130 operates to extinguish any vested right that claimants may have had. We recently addressed and rejected the same argument in Oregon Shores v. Board of County Commissioners , 297 Or. App. 269, 441 P.3d 647 (2019). We held that "[t]he text of section 5(3) requires a showing that a claimant's vested right existed on December 6, 2007, and no other date." Id. at 279-80, 441 P.3d 647. Here, as in Oregon Shores , any discontinuance that may have occurred took place after December 6, 2007, the only date on which a vested right had to exist. Thus, the statute and implementing ordinance are immaterial to claimants' Measure 49 claim in this case, and the writ-of-review court did not err in affirming the county's determination that the statute and ordinance did not apply.
B. Vested Right to Complete and Continue the Use Described in the Waiver
We turn to appellants' second argument. As noted above, the circuit court held that claimants had showed the necessary vested right to complete and continue the use described in their Measure 37 waivers even though they planned for buyers of the lots to build houses, rather than *248 planning to build houses themselves.[4] Appellants contend that claimants' plan to subdivide their property and sell lots, and their expenditures in pursuit of that plan, was not a "use of the property [that] complies with the waiver," Measure 49 § 5(3), and could not yield a vested right to complete "the use described in the waiver," id. , because subdividing property and selling buildable lots was not something that a landowner could do pursuant to a Measure 37 waiver.
We begin our consideration of that argument with section 5(3) of Measure 49, the provision under which claimants seek relief. That subsection provides as follows:
"A claimant that filed a claim under [Measure 37] on or before [June 28, 2007,] is entitled to just compensation as provided in * * * [a] waiver issued before [December 6, 2007,] to the extent that the claimant's use of the property complies with the waiver and the claimant has a common law vested right on [December 6, 2007,] to complete and continue the use described in the waiver."
*554 Thus, to succeed in a claim under section 5(3), a claimant must show (1) that "the claimant's use of the property complies with the [Measure 37] waiver" and (2) that the claimant has a common law vested right "to complete and continue the use described in the waiver." Here, as described above, in claimants' waivers, the county and the state agreed not to apply regulations preventing claimants from subdividing their property and building dwellings on the subdivided lots. However, although claimants' waivers *249 allowed claimants to subdivide and build houses, claimants did not intend to build houses. Rather, they intended to subdivide their property and sell lots on which others would build houses.
As we understand the circuit court's reasoning and claimants' and the county's argument on appeal, their view is that claimants' expenditures in pursuit of the development that they planned-subdivision of the land and sale of lots to others, who would build houses-created a vested right under section 5(3) of Measure 49 to complete not only the subdivision itself, but also the houses. In their view, that vested right runs with the land, so that, when claimants sell a subdivided lot to a buyer, the buyer receives the lot and the right to build a house on it.
Claimants and the county assert that the Supreme Court did not reject that possibility in Friends II , in which it held that the development that a claimant can have a vested right to complete is the one that the claimant intended, on or before December 6, 2007, to construct. 351 Or. at 246 & n. 20, 264 P.3d 1265 (noting that, to find the cost of "the planned development," the county had to find the cost of building the "type of homes [the claimant] planned to build" before Measure 49 took effect). Rather, as they understand Friends II , the court required only that, if a claimant intended to subdivide and sell lots rather than actually constructing houses, the claimant must provide evidence from which the governing body can find, as a matter of historical fact, how much buyers of the lots would have spent in December 2007 to build houses in the subdivision. Once the governing body has found the amount that the claimant would spend to prepare the subdivision and the amount that subsequent buyers would spend to build the houses, it adds those amounts together and plugs the resulting number in as the denominator of the expenditure ratio.
Appellants respond that, regardless of whether the Supreme Court's opinion in Friends II leaves open that possibility, claimants nevertheless cannot make the necessary showing under section 5(3) of Measure 49 because Measure 37 did not allow claimants to sell lots on which others could build houses. They contend that relief under section 5(3) of *250 Measure 49 is limited to the same relief that was allowed under a claimant's Measure 37 waiver, and subdividing and selling buildable lots was not something that claimants could do under their Measure 37 waivers.
We agree with claimants that the court's opinion in Friends II does not conclusively preclude their view of the correct calculation of the expenditure ratio. However, as explained below, we agree with appellants' alternative argument. Claimants cannot satisfy the requirements of section 5(3) of Measure 49 because their planned development was to sell lots on which others would build houses, but that arrangement was not allowed under their Measure 37 waivers. Said another way, section 5(3) of Measure 49 provides a way for claimants to finish projects that they began under Measure 37 waivers, but one of the limitations is that the claimants' plan had to be one that was allowed under Measure 37. Because (1) relief under section 5(3) of Measure 49 is limited to the same relief that was allowed under a claimant's Measure 37 waiver and (2) claimants' Measure 37 waivers did not allow them to sell buildable lots, they cannot obtain relief under section 5(3) of Measure 49.
1. Relief under section 5(3) of Measure 49 is limited to the same relief that was allowed under a claimant's Measure 37 waiver.
To evaluate appellants' first proposition, we return to the text of section 5(3) of Measure 49. "In interpreting statutes, our goal is to discern the intention of the legislature or, in the case of ballot measures, the *555 voters, by examining the text, context, and any pertinent legislative history of the statute." Oregon Shores , 297 Or. App. at 275, 441 P.3d 647 ; see also Friends I , 237 Or. App. at 166-67, 238 P.3d 1016 (citing State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009) ).
We readily conclude that the relief that a claimant can obtain under section 5(3) of Measure 49 is limited to the relief that would have been allowed under a claimant's Measure 37 waivers. The text of section 5(3) states that limitation twice: First, one of the elements of the claim is that "the claimant's use of the property complies with the [claimant's Measure 37] waiver." Measure 49, § 5(3). Second, the *251 claimant must show that "the claimant has a common law vested right on [December 6, 2007,] to complete and continue the use described in the waiver ." Id. (Emphasis added.) Plainly, in enacting section 5(3) of Measure 49, the voters intended to provide relief no broader than what was allowed under a claimant's Measure 37 waivers. See also Oregon Shores , 297 Or. App. at 277, 441 P.3d 647 (noting that section 5(3) provides a statutory right to relief "and the terms of that relief mirror the terms of the waiver").
2. Measure 37 waivers did not allow claimants to sell buildable lots .
We turn to whether claimants' Measure 37 waivers allowed them to sell buildable lots. The circuit court, claimants, and the county have advanced three ways in which, in their view, claimants' Measure 37 waivers and claimants' acts of subdividing the property and preparing it for houses create a right for a buyer to build on a lot that claimants subdivided and prepared for a house. Below, we consider, and reject, each of the three theories: first, that claimants' Measure 37 waivers, in themselves, allowed buyers to build houses on lots purchased from claimants; second, that claimants' subdivision of their property was a "use," as that term is used in Measure 37, that became nonconforming when claimants sold lots and thus allowed the buyers to build houses; and, third, that claimants' acts of subdividing the property and preparing it for houses created a vested right under Measure 37 that allowed others to build houses on the lots. Because we disagree with all of the theories that the circuit court, claimants, and the county have identified, and because we perceive no other way in which Measure 37 waivers could have allowed claimants to sell buildable lots, we conclude that Measure 37 did not allow claimants to sell buildable lots.
a. Claimants' Measure 37 waivers, in themselves, did not allow buyers to build on lots purchased from claimants.
Measure 37 "provided landowners with 'just compensation' for land use regulations, enacted after they had acquired their property, that restricted the use of the *252 property and, as a result, diminished its value." Friends II , 351 Or. at 224, 264 P.3d 1265. When a landowner made a claim for "just compensation" under Measure 37, "a government could choose: (1) to pay the landowner compensation for the diminished value of the property and enforce the regulation or (2) to waive the regulation and permit the owner 'to use the property for a use permitted at the time the owner acquired the property.' " Id. (quoting former ORS 197.352 (2005), renumbered as ORS 195.305 (2007) ). A Measure 37 "waiver" was an embodiment of the government's choice not to apply certain zoning regulations to allow the owner to use the property for a use allowed when the owner acquired the property instead of enforcing the zoning regulations and paying the owner compensation for the diminution in value. E.g. , Friends of Polk County v. Oliver , 245 Or. App. 680, 683-84, 264 P.3d 165 (2011), rev. den. , 351 Or. 586, 274 P.3d 857 (2012).
Subsection 8 of Measure 37 provided:
"Notwithstanding any other state statute or the availability of funds under subsection (10) of this section, in lieu of payment of just compensation under this section, the governing body responsible for enacting the land use regulation may modify, remove, or not to apply [sic ] the land use regulation or land use regulations to allow the owner to use the property for a use permitted at the time the owner acquired the property."
Former ORS 197.352(8) (2005). Measure 37 defined "owner" as "the present owner of the *556 property, or any interest therein." Former ORS 197.352(11)(C) (2005). Nothing in the text of Measure 37 implicitly or explicitly addressed the result of an owner's sale of the property.
The first question is whether claimants' Measure 37 waivers allowed subsequent buyers to build on lots that they bought from claimants. As explained below, we conclude that, under Measure 37, a governing body's choice to allow an owner to use the property for an otherwise unlawful use applies only to the owner. If the owner sells the property, the buyer receives the property subject to the zoning regulations in effect at the time of the sale.
The text of subsection 8 indicates that the present owner of the property is the only person whom a governing *253 body may allow "to use the property for a use permitted at the time the owner acquired the property." The text authorizes a governing body "not to apply" certain land use regulations that otherwise bind the governing body's decisions, but only with respect to the present owner, that is, "to allow the owner to use the property" in an otherwise unlawful way. Former ORS 197.352(8) (2005) (emphasis added). If the governing body were to allow someone other than the owner to use the property as described in the owner's waiver, it would be in violation of current zoning laws. See, e.g. , ORS 215.203 (providing that land within exclusive farm use zones "shall be used exclusively for farm use except as otherwise provided in ORS 215.213, 215.283 or 215.284").
The structure of Measure 37 confirms the textual indication that the present owner of the property is the exclusive recipient of Measure 37 relief. Measure 37 did not limit those entitled to relief to people who owned property when Measure 37 passed; its application was prospective as well. See former ORS 197.352(1) (providing for "just compensation" for the owner of property whenever "a public entity enacts or enforces a new land use regulation" as well as when it enforces a regulation enacted before December 2, 2004). Thus, Measure 37 applied to every property owner, even one who acquired land from a previous Measure 37 claimant. And Measure 37 operated the same way for all property owners: It set the clock back to the state of the land use regulations that existed when the owner acquired the property, by providing a remedy for any decrease in value that had occurred during the period of ownership.
That suggests that a buyer who takes property from a Measure 37 claimant does not receive the seller's entitlement to relief under Measure 37 along with the property, because the buyer is entitled to his or her own remedy under Measure 37-albeit one that will compensate only for diminution in value that occurs after the date of purchase. Thus, the text and structure of Measure 37 unambiguously indicate that the relief granted by a Measure 37 waiver-the ability to "use the property for a use permitted when the owner acquired the property"-applies solely to the present owner. In this case, then, buyers of lots could not build houses pursuant to claimants' Measure 37 waivers.
*254 b. Claimants' subdivision of their property was not a "use," as that term is used in Measure 37, that became nonconforming when claimants sold lots.
Next we consider whether, by subdividing and preparing their property for houses, claimants established a "use" pursuant to their Measure 37 waivers. As set out above, a Measure 37 waiver allowed the present owner to "use the property for a use permitted at the time when the owner acquired the property." Former ORS 197.352(8) (2005). In Friends I , we interpreted "the use of the property" as that phrase is used in section 5(3) of Measure 49. We concluded that a residential "use" in that context meant "the actual employment of land for a residential purpose." 237 Or. App. at 167, 238 P.3d 1016. We explained as follows:
"Among its numerous definitions, 'use' is generally defined to mean 'to put into action or service: have recourse to or enjoyment of: EMPLOY.' Webster's Third New Int'l Dictionary 2523 (unabridged ed. 2002). Analogously, 'farm use' is defined by ORS 215.203(2)(a), for purposes of statutes regulating zoning of agricultural lands, as 'the current employment of land for the primary purpose of obtaining a profit in money by [various agricultural activities].'
*557 Zoning laws typically define allowed land 'uses' by referencing particular activities on land or structural improvements to land. See, e.g. , ORS 215.213 and ORS 215.283 (listing of 'uses' allowed in exclusive farm use zones as including certain types of structures (e.g., 'public or private schools,' 'churches,' and 'dwellings') and 'operations' or activities on land (e.g. , 'operations for the exploration for minerals' and 'creation, restoration or enhancement of wetlands')); ORS 215.441 and ORS 227.500 (regulating 'use of * * * real property for activities customarily associated with' places of worship). Thus, the plain meaning of the text confirms, as the reviewing court concluded, that 'use of the property' means the actual employment of land for a residential purpose."
Id. (Brackets in Friends I .)
We conclude that a "use," as that term appears in the phrase "a use permitted at the time the owner acquired the property" in subsection 8 of Measure 37 likewise means actual employment of the land for a particular *255 purpose-here, residential. As set out above, in Friends I , we explained that "use" has an established meaning in the context of land use law, and that the voters intended to give the word that meaning in section 5(3) of Measure 49. 237 Or. App. at 167, 238 P.3d 1016. For similar reasons, we reach the same conclusion with respect to the meaning of "use" in "a use permitted at the time the owner acquired the property" in subsection 8 of Measure 37: The measure is drafted as a land-use statute, and, by employing "use" as a noun, it demonstrates voters' intent to adopt a standard land-use meaning: actual employment of the land for a particular purpose. Friends I , 237 Or. App. at 167, 238 P.3d 1016 ; see also Black's Law Dictionary 1775 (10th ed. 2014) (defining "use" as "[t]he application or employment of something"). Thus, a residential "use" is a house, not just a subdivision of land. Campbell v. Clackamas County , 247 Or. App. 467, 476, 270 P.3d 299 (2011), rev. den. , 352 Or. 341, 288 P.3d 275 (2012) (explaining that the reasoning in Friends I leads to that conclusion); accord. Columbia Hills v. LCDC , 50 Or. App. 483, 490-91, 624 P.2d 157, rev. den. , 291 Or. 9, 631 P.2d 340 (1981) ("[P]latted but undeveloped land is not normally regarded as a 'use' in zoning law for purposes of establishing a prior non-conforming use.").
Accordingly, pursuant to a Measure 37 waiver, the present owner could "use the property for a use permitted at the time the owner acquired the property" by subdividing the land and building a house on the new lot. However, a subdivision of land, without houses, is not a "use permitted at the time the owner acquired the property because it is not a 'use.' "
Thus, if the previous owner has obtained a Measure 37 waiver, subdivided the property, and built a house-that is, if the previous owner has established a "use" of the property-we assume, without deciding, that, when the sale takes place, the use, lawful for the previous owner but unlawful for the buyer, becomes a nonconforming use that can be continued. See generally ORS 215.130(5) (providing that lawfully established uses may be continued, even if they do not conform to current zoning regulations). The situation where the buyer buys a lot differs from the situation where the buyer buys a house because, as explained above, *256 a subdivided but vacant lot is not a "use" that can become nonconforming when it is transferred from the Measure 37 claimant (with respect to whom it is lawful) to the buyer (with respect to whom it is unlawful). In this case, then, the subdivided lots, without houses, were not established uses that could become allowed nonconforming uses when claimants transferred them to buyers.
c. Claimants' acts of subdividing the property and preparing it for houses did not yield a vested right that allowed others to build houses on the lots.
Finally, we consider whether claimants' expenditures in preparation for their plan of selling lots pursuant to their Measure 37 waivers gave them a vested right to build houses on the lots.[5] As we understand it, the *558 circuit court reasoned that, when the owner subdivides and prepares a lot for a house that the owner is allowed to build pursuant to a Measure 37 waiver, the owner obtains a vested right to build a house on the lot, even though the owner does not plan to build a house. In its view, that vested right is an absolute property right that subsequently runs with the land and, thus, is transferred to the buyer along with the lot.
We disagree because we conclude that, in the unique circumstances created by the operation of a Measure 37 waiver-circumstances in which an owner's ability to lawfully complete a use depends entirely on his or her own actions-the vested rights doctrine does not apply.
Measure 37 is unique among land use statutes because it prohibits application of land use regulations to an owner based on an attribute of the owner, longevity of ownership. Former ORS 197.352(8) (2005) (allowing the governing body to modify, remove, or not apply land use regulations "to allow the owner to use the property for a use permitted at the time the owner acquired the property").
*257 As explained above, the result is that, unlike most applications of land use laws, Measure 37 relief belongs exclusively to a particular owner rather than applying directly to the land. 298 Or. App. at 251-53, 446 P.3d at 555-56; see, e.g. , Arden H. Rathkopf, 3 Rathkopf's The Law of Zoning and Planning § 58:23 (5th ed. 2019) ("Simply, a variance conveys rights which inure to the benefit of the property involved.").
In Holmes , the Supreme Court explained that "[t]he allowance of nonconforming uses applies not only to those actually in existence but also to uses which are in various stages of development when the zoning ordinance is enacted ." 265 Or. at 197, 508 P.2d 190 (emphasis added). Considering the potential for a vested right under Measure 37 alone, as we are doing here, however, no zoning ordinance "is enacted" that prohibits residential use of the land. Id. Instead, as described above, when the owner sells the property, the owner's permission to use the land for a use allowed when the owner acquired the property ends, and current zoning regulations apply.
In our view, that difference matters because it means that, in the Measure 37 context, the owner, and the owner alone, controls whether, and when, a change in the law takes place. That is, as long as a claimant owns the property, the use described in the claimant's Measure 37 waiver is lawful. When the claimant sells the property, current zoning regulations apply and prohibit all but farm use.
In the context of a use that is begun, but not completed, when the law changes, a vested right is a circumstance-specific application of the principles of equity. See Friends I , 237 Or. App. at 160, 238 P.3d 1016 ("The policy underlying the notion of vested rights is basically one of fairness." (Internal quotation marks and brackets omitted.)); see also Holmes , 265 Or. at 197, 508 P.2d 190 (citing "[t]he courts and the text writers" as the source of vested rights doctrine); BBC Land & Development, Inc. v. Butts County , 281 Ga. 472, 473-74, 640 S.E. 2d 33 (2007) (explaining that a vested right to complete development begun under previous zoning is a personal interest of the present owner that comes into existence as a result of equitable considerations); Patricia E. Salkin, 4 American Law of Zoning § 32:3, 32-17 (5th ed. 2008) ("In states[, including *258 Oregon,] that follow the balancing interest test * * *, vested rights depend on equitable fairness, both to the property owner and to the general public." (Internal quotation marks omitted.)). All of the Holmes factors address equitable considerations, and the two "good faith" factors are particularly focused on the landowner's belief that the existing law will continue in effect. 265 Or. at 198, 508 P.2d 190 (two factors to be considered in the vested rights analysis are "the good faith of the landowner" and "whether or not [the landowner] had *559 notice of any proposed zoning or amendatory zoning before starting his improvements"); see also Friends II , 351 Or. at 241, 264 P.3d 1265 ("[O]ne of the sources that this court relied on in Holmes explained that the law would not help one who waits until after an ordinance has been enacted forbidding the proposed use and * * * hastens to thwart the legislative act by making expenditures a few hours prior to the effective date of the ordinance." (Internal quotation marks omitted.)).
Whether we consider the question as a matter of the equities generally or the good faith factors in particular, an owner who develops property with the goal of creating a transferable right to build a house based on a nontransferable Measure 37 waiver cannot obtain a vested right to complete the use. As we have explained, a Measure 37 claimant can subdivide the property and build a house. And the claimant has exclusive control of whether the completion of that use is allowed, because the only obstacle to completing the use is one created by claimant him- or herself, when he or she sells the property to someone who lacks the right to complete the use.[6] In the unique context of Measure 37, we conclude that, if the landowner never intended to complete the use him- or herself, the equities do not weigh in favor of creating a vested right to complete the use.
III. CONCLUSION
Here, claimants intended to subdivide the land and sell lots to buyers who would build houses. However, claimants' Measure 37 waivers did not allow them to sell buildable lots. That conclusion is dispositive of claimants' vested *259 rights claim under Measure 49 because the relief allowed under section 5(3) of Measure 49 is no broader than the relief to which a claimant was entitled under the claimant's Measure 37 waivers. Here, claimants' project-selling buildable lots-was not permitted by their Measure 37 waivers; consequently, they could not satisfy the requirements of section 5(3) of Measure 49. The county and the circuit court erred in concluding otherwise.
Reversed and remanded.

For a detailed explanation of the complex legal context in which this dispute arose, see Friends of Yamhill County v. Board of County Commissioners , 351 Or. 219, 222-25, 264 P.3d 1265 (2011) (Friends II ).
Section 5(3) of Measure 49 provides,
"A claimant that filed a claim under [Measure 37] on or before [June 28, 2007,] is entitled to just compensation as provided in * * * [a] waiver issued before [December 6, 2007,] to the extent that the claimant's use of the property complies with the waiver and the claimant has a common law vested right on [December 6, 2007,] to complete and continue the use described in the waiver."

Measure 37 was codified as former ORS 197.352 (2005) and was subsequently amended twice and renumbered as ORS 195.305, all in 2007. Or. Laws 2007, ch. 354, § 28; Or. Laws 2007, ch. 424, § 4.

At the same time, in a separate action, FOYC and the Biggerstaffs sought declaratory and injunctive relief against the Board of Commissioners of Yamhill County and claimants based on the county's failure to apply ORS 215.130 and a county ordinance implementing that statute to claimants' claim under section 5(3) of Measure 49. The trial court concluded that a writ of review was the exclusive remedy and, consequently, dismissed the complaint. On appeal, we affirmed. Friends of Yamhill County v. Board of Commissioners , 278 Or. App. 472, 485, 377 P.3d 670 (2016).

Below, in addition to addressing the merits of appellants' contention that claimants' Measure 37 waivers did not allow them to sell buildable lots, the circuit court stated that the issue "was already decided previously and upheld on review and appeal (or lack thereof) and need not be re-litigated or re-considered by the County, or this court on review." Claimants and the county do not defend that reasoning on appeal.
The circuit court's conclusion was based on the understanding that the court's judgment in the first writ-of-review proceeding regarding this claim had been affirmed in part on appeal. However, in the first appeal, we reversed the entirety of the circuit court's judgment. Biggerstaff , 240 Or. App. at 56, 245 P.3d 688 ("Reversed and remanded."). Thus, no part of the circuit court's previous judgment remains in effect, and the doctrine of issue preclusion, which we understand to have been the basis for the court's ruling, does not apply. Nelson v. Emerald People's Utility Dist. , 318 Or. 99, 103, 862 P.2d 1293 (1993) ("Issue preclusion arises in a subsequent proceeding when an issue of ultimate fact has been determined by a valid and final determination in a prior proceeding.").

As explained above, at this point in our analysis, we are evaluating only whether, under Measure 37, a landowner could subdivide property and sell buildable lots. We understand the circuit court, claimants, and the county to rely on the vested rights doctrine to explain why the lots that claimants created were buildable despite the fact that Measure 37 provides rights only to the present owner. Thus, in this discussion, we are addressing the idea that the vested rights doctrine, as applied under Measure 37 standing alone , allows a buyer to build on a lot purchased from a Measure 37 claimant.

We are addressing only situations in which the claimant intends from the outset to sell lots. The analysis may be different with respect to claimants who sell or transfer the property due to unexpected circumstances.